**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Charles T. LOTT, Defendant–Appellant.**

**No. 87–2523.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 26, 1988.

Decided Aug. 11, 1988.

Anthony E. Novak, Urbana, Ill., for defendant-appellant.

Thomas E. Karmgard, Asst. U.S. Atty. (J. William Roberts, U.S. Atty.) U.S. Atty. Office, Danville, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, and POSNER, Circuit Judge, and PELL, Senior Circuit Judge.

BAUER, Chief Judge.

Charles Lott appeals from his convictions for distribution and possession with intent to distribute phencyclidine (PCP) in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. He contends that the district court erred in allowing the government to use his preliminary hearing testimony to impeach him at trial because his retained counsel at the preliminary hearing was acting under a conflict of interest in violation of his Sixth Amendment right to the assistance of counsel. He also contends that the district court erred in admitting certain physical evidence, including the PCP involved, without adequate foundation and that, without that evidence, the government did not prove him guilty beyond a reasonable doubt. We reject his arguments and affirm his convictions.

## I.

On September 27, 1985, Chicago police officer Nathanial Reed, acting undercover and "wired" with a microphone, met with Lott to arrange an October 1, 1985 sale of one gallon of liquid PCP for $30,000, and two gallons of a diluting substance for $13,000. On October 1, the United States Drug Enforcement Administration (DEA), together with state and local police agencies, set up a surveillance operation at a Holiday Inn in Bradley, Illinois. That morning, Reed called Lott's beeper number and Lott returned Reed's call to say he needed a little time and would be at the Holiday Inn at 3:00 p.m. Later, at 3:10 p.m., when Reed called Lott again to inform Lott that Reed did not have all day, Lott said he would be at the motel shortly.

At 3:26 p.m., Lott met Reed in the lobby of the Holiday Inn. Lott said he did not have the PCP; he wanted to see Reed's money before he delivered it. After Reed took Lott to the Reed's motel room and showed him the money, Lott left to get the PCP. At 5:41 p.m., after Lott had informed Reed two more times that the PCP was on the way, Lott finally pulled up in front of the motel and motioned for Reed, who was standing in the doorway of the motel lobby, to follow him to the rear of the building. As Reed walked toward the rear of the motel, Lott's brother, Bishop, drove up behind Reed, and Bishop Lott and Reed had a brief conversation. Bishop Lott then parked his car directly in front of Reed's motel room.

At the rear of the Holiday Inn, Reed got into Charles Lott's car. Charles Lott stated that he had the PCP and pointed to a red gasoline can on the car's floor. Reed told Charles Lott that he wanted a sample. Reed took an eyedropper and mouthwash bottle from his jacket pocket, extracted some of the liquid from the can, and put it into the mouthwash bottle. Reed then told Charles Lott that he was going to have his chemist test the liquid before he handed over the money. As Reed got out of the car, he gave a prearranged arrest signal to the surveillance team, and that was that.

On October 2, 1985, both Charles and Bishop Lott were charged by complaint with conspiracy to distribute PCP. On October 8, 1985, Magistrate Kaufman held a preliminary detention hearing, at which attorney Earl L. Washington appeared on behalf of both Charles and Bishop Lott. Initially, Washington indicated that he would waive the preliminary hearing, but after a brief conversation with his clients, he decided to proceed. Following the government's evidence, Washington stated that he had no evidence to present on behalf of Charles or Bishop Lott, but after another brief conference with the Lott brothers, Washington told the court that Charles Lott would testify. Washington then questioned Charles Lott about his brother Bishop's involvement, or lack thereof, in the activities of October 1, 1985. After the Assistant United States Attorney conducted a brief cross-examination, Washington argued that although there probably was sufficient probable cause to hold Charles Lott over for trial, there was no probable cause to hold over Bishop Lott.

A grand jury thereafter returned a four-count indictment against both Charles and Bishop Lott, charging them with distribution, possession with intent to distribute, and conspiracy to possess with intent to distribute and to distribute PCP. On December 2, 1985, Charles Lott pled guilty to three counts, and subsequently was sentenced to concurrent ten-year prison terms on each count. The court dismissed the remaining count upon the government's motion. On June 4, 1987, however, the district court vacated Charles Lott's sentence and ordered that he be given a new trial, holding that Washington "failed to grant effective assistance of counsel to the defendant" at the preliminary hearing because Washington "had a direct conflict of interest in his dealings on behalf of the defendant." Before his new trial, Charles Lott moved to prevent the government from using his preliminary hearing testimony for impeachment purposes. The district court denied the motion. After another count against Charles Lott was dismissed upon the government's motion, the case was tried to a jury, which found Charles

Lott guilty on the two remaining counts. During the trial, the government used Lott's preliminary testimony to impeach his direct testimony. Charles Lott was sentenced to concurrent ten-year sentences on each count.

## II.

### A.

■ Lott first contends that the district court erred in allowing the government to impeach him at trial with his testimony from the preliminary hearing, at which the government concedes he did not receive the effective assistance of counsel required under the Sixth Amendment. Lott argues that reversal is mandated by the Supreme Court's decision in *New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979). The government counters that Lott's preliminary hearing testimony was admissible to impeach Lott's direct testimony at trial under the antiperjury rationale of *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and its progeny.

The Supreme Court first dealt with the use of illegally seized evidence to impeach a defendant's credibility in *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). There, in upholding the use of evidence seized in violation of a defendant's Fourth Amendment rights for impeachment purposes, the Court stated:

It is one thing to say that the Government cannot make affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.

*Id.* at 65, 74 S.Ct. at 356. Extending the exclusionary rule that far, said the Court, would pervert the Fourth Amendment. *Id.* In *Harris* and *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), upon which the government relies, the Court allowed the use of statements, concededly taken in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16

L.Ed.2d 694 (1966), and inadmissible in the government's case-in-chief, to impeach the defendant's testimony at trial. "In both cases the Court weighed the incremental deterrence of police illegality against the strong policy against countenancing perjury. In the balance, use of the incriminating statements for impeachment purposes prevailed." *Portash*, 440 U.S. at 458, 99 S.Ct. at 1297. According to the Court in *Harris*, the "shield of *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Harris*, 401 U.S. at 226, 91 S.Ct. at 646.

Recently, in *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), the Court again sanctioned the use of illegally seized evidence for impeachment purposes, even where the testimony sought to be impeached is first elicited in response to proper cross-examination. In doing so, the Court reaffirmed its antiperjury line of cases:

We ... think that the policies of the exclusionary rule no more bar impeachment here than they did in *Walder, Harris* and *Hass*. In those cases, the ends of the exclusionary rules were thought adequately implemented by denying the government the use of the challenged evidence to make out its case in chief. The incremental futhering of those ends by forbidding impeachment of the defendant who testifies was deemed insufficient to permit or require that false testimony go unchallenged, with the resulting impairment of the integrity of the factfinding goals of the criminal trial. We reaffirm this assessment of the competing interests, and hold that a defendant's statements made in response to proper cross-examination reasonably suggested by the defendant's direct examination are subject to otherwise proper impeachment by the government, albeit by evidence that has been illegally obtained and that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt.

*Id.* at 627–28, 100 S.Ct. at 1916–17.

Against this longstanding policy against countenancing false testimony at trial, Lott

asks us to weigh *Portash.* There, after a lengthy investigation, a New Jersey grand jury subpoenaed a public official, Portash, who initially expressed an intention to claim his Fifth Amendment privilege against compulsory self-incrimination. Prosecutors and Portash's lawyers then agreed that if Portash testified before the grand jury, neither his statements nor any evidence derived therefrom could, under New Jersey law, be used in subsequent criminal proceedings. Portash then testified under legislative immunity. Before his subsequent trial for extortion and criminal misconduct while in office, Portash sought a ruling prohibiting any use at trial of his prior grand jury testimony. The trial court refused to rule that the prosecution could not use Portash's grand jury testimony for purposes of impeachment, and Portash thus chose not to testify on his own behalf. He was ultimately convicted on one of two counts.

The Supreme Court affirmed the New Jersey appellate court's reversal of Portash's conviction, rejecting the State of New Jersey's contention that *Harris* and *Hass* controlled the question whether Portash's immunized grand jury testimony was admissible for impeachment purposes at his trial. The State had argued that the interest in preventing perjury was as strong in *Portash* as it was in *Harris* and *Hass*, and that Portash's statements to the New Jersey grand jury were at least as reliable as the defendants' in the latter two cases. The Court, however, refused to balance its strong antiperjury policy against Portash's Fifth Amendment privilege against compulsory self-incrimination. According to the Court, the state had overlooked a crucial distinction between *Harris* and *Hass* on the one hand, and *Portash* on the other: "In *Harris* and *Hass* the Court expressly noted that the defendant made 'no claim that the statements made to the police were coerced or involuntary.'" *Portash,* 440 U.S. at 458, 99 S.Ct. at 1297 (citing *Harris,* 401 U.S. at 224, 91 S.Ct. at 645; *Hass,* 420 U.S. at 722–23, 95 S.Ct. at 1220–21). According to the *Portash* Court, "[t]hat recognition was central to the decisions in those cases." *Id.* 440 U.S. at 459, 99 S.Ct. at 1297. Portash's testimony given in response to a grant of legislative immunity, on the other hand, was "the essence of coerced testimony. In such cases there is no question as to whether physical or psychological pressures overrode the defendant's will; the witness is told to talk or face the government's coercive sanctions, notably a conviction for contempt." *Id.* Thus, because Portash's grand jury testimony implicated Portash's Fifth Amendment privilege against compulsory self-incrimination "in its most pristine form," the Court refused to balance the constitutional violation against its antiperjury policy. *Id.* The Court thus affirmed the New Jersey appellate court's ruling that Portash's immunized grand jury testimony could not be used for impeachment purposes at his later criminal trial. *Id.,* at 459–60, 99 S.Ct. at 1297–98.

Lott argues that because his Sixth Amendment right to the effective assistance of counsel was violated at the preliminary hearing, it is impermissible under *Portash* to "balance" that right against any countervailing antiperjury considerations. He cites the Second Circuit's decision in *United States v. Brown,* 699 F.2d 585 (2d Cir.1983), in support of his argument. There, an FBI agent, knowing that the defendant in a bank robbery prosecution had been indicted and was awaiting arraignment and appointment of counsel within the hour, spoke with the defendant, who then allegedly admitted his involvement in the robbery. At trial, the prosecution was permitted to use the defendant's statements to the FBI agent to impeach his direct testimony. The Second Circuit, relying on *Portash,* reversed the defendant's conviction, holding that a statement taken by the FBI agent in violation of the defendant's Sixth Amendment right to counsel could not be used to impeach his trial testimony. *Id.* at 590. The court in *Brown* refused to balance the defendant's Sixth Amendment protection against the antiperjury considerations expressed in *Harris* and *Hass. Id.*

*Portash* and *Brown,* however, are quite different from this case. Both involved

government coercion or misconduct in eliciting defendants' statements that rendered the subsequent use of those statements at trial for impeachment purposes wholly untenable. In *Portash*, it was the State of New Jersey's grant of legislative immunity that elicited Portash's grand jury testimony that was later used to impeach him at trial. Although not improper, the State of New Jersey's effort to elicit Portash's grand jury testimony certainly was coercive, as the Supreme Court emphasized. Portash had no choice but to testify before the grand jury. In *Brown*, it was the FBI agent's questioning of the indicted defendant in violation of his Sixth Amendment right to counsel that elicited the testimony later used for impeachment purposes at the defendant's trial. As the Second Circuit noted, "the Sixth Amendment requires that the accused have the assistance of counsel or that the government meet the 'heavy burden of proving that any inculpatory statements thus obtained were voluntarily given after a valid waiver of the right to counsel.'" *Brown*, 699 F.2d at 589. The government in *Brown*, however, did not even argue that the defendant voluntarily waived his Sixth Amendment rights before answering the FBI agent's questions, *id.*, prompting the court to conclude that the FBI agent was "seeking to elicit an uncounseled confession," a practice it "repeatedly disapproved." *Id.* In both *Portash* and *Brown*, then, the defendants' pretrial statements that were later used to impeach them at trial were obtained by the government and were coerced or involuntary under well-settled constitutional principles.

Lott's case is a different story. Here, there is no claim that the government elicited his preliminary hearing testimony through coercion or misconduct. To the contrary, Lott had a choice at the preliminary hearing; better yet: *choices*. Lott could have chosen not to testify, to testify truthfully, or to commit perjury. Later, he faced the same three alternatives at his trial, where his testimony indicated that he chose the last of the three in at least one of the two proceedings. In short, Lott voluntarily created the predicament he now asks

us to get him out of. We refuse to do so; the underlying message of both *Portash* and *Brown*—that a criminal defendant cannot be compelled or coerced into contributing to his or her own conviction—is not applicable to this case. On the other hand, the antiperjury considerations that generated the *Harris* line of considerations *are* applicable. We therefore hold that Lott's preliminary hearing testimony was admissible for impeachment purposes at his trial. To hold otherwise would pervert Lott's Sixth Amendment right to counsel into a right to commit perjury.

### B.

Lott next contends that the district court abused its discretion in admitting into evidence the eyedropper, mouthwash bottle, liquid PCP sample, and the gasoline can and its contents Reed obtained from Lott on October 1, 1985. He argues that the government failed to establish for each item a sufficient chain of custody from the time of his arrest until its introduction at trial. We disagree.

At trial, the eyedropper, mouthwash bottle, and liquid PCP sample obtained by Reed from Lott were government exhibit 4. Reed testified that he recognized exhibit 4 as the items he used to obtain the sample from Lott, and that he gave exhibit 4 to an Agent Wooley, who transported the items to the DEA Field Office in Chicago, where the items were secured pending transfer to the laboratory. Agent Wooley testified that he recognized government exhibit 4 as the items he received from Reed, but the government offered no testimony concerning the transfer of exhibit 4 from the DEA Field Office to the DEA laboratory. The government's forensic chemist testified, however, that he obtained exhibit 4 from the DEA vault, tested the sample for the presence of PCP, removed the ether from the sample, resealed the items, and then placed the items back into the vault.

The gasoline can was government exhibit 5, which Reed recognized at trial as the can in Lott's vehicle. Wooley also recognized exhibit 5 at trial as the gasoline can he removed from Lott's car on October 1,

1985. Wooley also testified that it was in substantially the same condition as when he recovered it except for the presence of identification evidence stickers, fingerprint powder, and the fact that the liquid contents had been removed. Although the government offered no testimony on how the can was transported from the Holiday Inn to the DEA Field Office in Chicago, Wooley said he saw the gasoline can at the field office and sealed it pending transfer to the DEA laboratory, where it was later submitted for analysis. The government's chemist testified that he removed exhibit 5 from the laboratory vault, removed the liquid from within it, tested the liquid for the presence of PCP, evaporated the ether from the liquid PCP, and placed the liquid PCP into plastic containers, which at trial were government exhibit 5A. The chemist, who identified exhibit 5A at trial by viewing his initials, signature, and laboratory number on the containers, placed exhibit 5A into the laboratory vault. The chemist testified that he then submitted the can without the liquid contents to the FBI laboratory for fingerprint analysis. Although the government offered no testimony about the transportation of exhibit 5 to and from, or its analysis at, the FBI laboratory, the chemist testified that the can was returned from the FBI laboratory in substantially the same condition as when it was sent. The chemist recognized exhibit 5 as the gasoline can in question by viewing his initials and the laboratory number on the card attached to the exhibit.

Wooley testified that, before Charles Lott's trial, he signed government exhibits 4, 5, and 5A out of the DEA laboratory vault and brought them to federal court in Danville, Illinois, where the items were admitted into evidence at a previous hearing in the trial of Bishop Lott. The exhibits were then withdrawn from evidence in that proceeding and returned by Wooley to the DEA laboratory vault. Wooley said that he again removed exhibits 4, 5, and 5A from the DEA laboratory vault and transported the items to the federal building in Danville, Illinois, where the exhibits were secured overnight in the United States Attorney's Office and then brought to the

courtroom by Wooley, where they were admitted into evidence in Charles Lott's case.

■ "The standard for the admission of exhibits into evidence is that there must be a showing that the physical exhibit being offered is in substantially the same condition as when the crime was committed." *United States v. Aviles*, 623 F.2d 1192, 1197 (7th Cir.1980). This determination is for the trial judge to make and we will not overturn it absent a clear abuse of discretion. *Id.* We find no such abuse here. Lott objects to the introduction of government exhibits 4, 5, and 5A on the basis of the government's failure to show a complete chain of custody. But the missing links are minor: the government's lack of testimony concerning the transfer of exhibit 4 from the DEA field office to the DEA laboratory and the transfer of exhibit 5 from the Holiday Inn to the DEA field office or from the field office to the FBI laboratory for fingerprint analysis. In any case, the government need not prove a perfect chain of custody for evidence to be admitted at trial; gaps in the chain normally go to the weight of the evidence rather than its admissibility. *United States v. Jefferson*, 714 F.2d 689, 696 (7th Cir.1983); *United States v. Lampson*, 627 F.2d 62, 65 (7th Cir.1980). Moreover, the government need only show that it took reasonable precautions to preserve the original condition of the evidence, it does not have to exclude all possibilities of tampering with the evidence. *Aviles*, 623 F.2d at 1198. In addition, a presumption of regularity exists with respect to official acts of public officers and, absent any evidence to the contrary, the court presumes that their official duties have been discharged properly. *Id.*

The district court was satisfied that the government established a sufficient foundation for each of the above items for physical evidence. On this record, we cannot conclude that it abused its discretion in reaching that conclusion. In our view, the chains of custody for the exhibits were substantially complete and the trial court could properly conclude, taking into account the lack of evidence of any govern-

ment wrongdoing along with the presumption that the government's agents properly performed their duties, that the evidence was admissible.

The district court is

AFFIRMED.