# In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 04-2183

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PERCY E. MOORE,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 03 CR 50018—**Philip G. Reinhard**, *Judge.*

---

ARGUED NOVEMBER 10, 2004—DECIDED OCTOBER 13, 2005

---

Before COFFEY, RIPPLE, and SYKES, *Circuit Judges.*

COFFEY, *Circuit Judge.* On August 28, 2003, Percy E. Moore was convicted in the United States District Court for the Northern District of Illinois of three counts of knowingly and intentionally distributing cocaine hydrochloride (cocaine powder) and cocaine base, in violation of 21 U.S.C. § 841(a)(1). On April 23, 2004, he was sentenced to a term of 175 months. On appeal, Moore argues for reversal of his conviction, alleging that the district court erred by (1) refusing to allow the introduction of Social Security Administration records to confirm Moore's inability to understand the conversations with a confidential informant; (2) admitting expert witness testimony without the foundational testimony required by Rule 702 of the Federal Rules of

Evidence; (3) ruling that the government had proved Moore guilty beyond a reasonable doubt in light of inconsistent and contradictory testimony by a confidential informant; and (4) concluding that Moore was competent to be sentenced. We affirm.

## I. Background

Percy Moore was charged with three counts of knowingly and intentionally distributing cocaine and cocaine base to Rosa Flemons, a Drug Enforcement Administration ("DEA") confidential informant. While investigating Moore, the DEA sought the assistance of Flemons, who had been convicted three times of drug offenses, once in federal court for conspiracy to distribute cocaine and twice in state court for possession of a controlled substance. In exchange for reducing by half the low end of the federal sentence that she was facing, Flemons agreed to serve as a confidential source for the DEA.

On September 13, 2002, Flemons and her husband, Robert, met with DEA Special Agent Douglas Hopkins and Rockford Police Detective Brian Skaggs in preparation for her first attempt to purchase drugs from Moore. According to the trial transcript, Flemons had never purchased drugs from Moore prior to September 13, 2002.[1] Due to concerns for her safety, Flemons requested that she not be required to wear audio recording equipment during the initial buy, and her supervising agents agreed to her request. According to Flemons and the agents, before Flemons and her husband set off to meet Moore, the agents

---

[1] Flemons' friend "Kathy" had introduced her to Moore two days earlier; Flemons testified that during their first encounter, she asked Moore if she could purchase drugs from him and he agreed.

in charge searched Flemons, her husband, and their car for cash and contraband, and none was found. Agent Hopkins gave Flemons $250 to purchase a quarter ounce of cocaine. At approximately 5:00 p.m., Flemons and her husband drove to Moore's home on the 100 block of South Central in Rockford, Illinois, and found him standing in the front yard with a man and a woman. After the man left, Flemons approached Moore and told him that she wanted to buy a "quarter." According to her testimony, Moore and the unidentified woman went inside the house for a couple of minutes and returned with a plastic bag filled with a white powder. At this time, the woman accompanying Moore handed the plastic bag to Flemons, and Flemons attempted to hand her the $250. The woman pointed to Moore, and Flemons proceeded to hand him the money. Flemons testified that before she left, she asked Moore how much a larger amount of cocaine would cost, and he advised her that a kilo would cost $21,000. She returned to the car and drove to a predetermined location to meet the handling officers. When she arrived, she gave the plastic bag with the white substance to Agent Hopkins, and, once again, he searched her and her husband for money and contraband.

According to Agent Hopkins, he followed the Flemonses until they were near the 100 block of South Central and then transferred surveillance duties to Officer Robert Swank of the Winnebago Sheriff's Department, who was stationed in a school parking lot across the street from Moore's home. According to Officer Swank, he had an unobstructed view of Moore's house. At approximately 5:00 p.m., he observed a small white vehicle with the Flemonses arrive at Moore's home. During his testimony at trial, Officer Swank described the transaction, as depicted by Flemons in her testimony, up until Moore and the unidentified woman returned from inside the house; at that point, he was unable to observe the exchange of money and contraband because it took place behind a vehicle with its hood raised, obstructing his view.

Flemons' next meeting with Moore took place on September 23, 2002. Flemons contacted Moore by telephone, and, during their recorded conversation, she asked Moore if she could stop by to talk. Moore told her to "come on over." Prior to departing for her meeting with Moore, Flemons and her husband were again searched for contraband and money and were given $250 to purchase the narcotics. She wore a concealed recording device to this second meeting, and Officer Swank filmed the encounter. When Flemons arrived at Moore's home, Moore informed her that he was "dry."

Flemons continued to contact Moore by telephone over the next couple of weeks. The conversations were recorded. Flemons testified that during each conversation, Moore conveyed to her, using various terms and metaphors, that he presently had no contraband in his possession. Finally, on October 9, 2002, Flemons made another recorded telephone call to Moore, during which Moore told her that he was "all right." Moore then instructed her to come to the thrift store next to his house. Before leaving for the meeting with Moore, the agents searched Flemons, her husband, and their vehicle for cash or contraband and provided Flemons with $800 in cash and a concealed, activated audio recorder. Agent Hopkins again followed the Flemonses until they were near Moore's house, at which point Officer Nick Cunningham of the Winnebago County Sheriff's Department, who was parked across the street from Moore's house, picked up the surveillance. When Flemons arrived at the thrift store, Moore stated that he needed additional time to obtain the contraband. The Flemonses left and traveled to a nearby house to contact Agent Hopkins. Thereafter, they drove to a local fast-food restaurant to eat lunch before returning to the thrift shop. Upon their return, Moore motioned for Flemons to follow him into the back room of the store. According to Flemons, he directed her to a cup located on the floor in the back room. Flemons approached the cup and observed a plastic bag within, which she

believed contained an ounce of crack cocaine. Flemons
picked up the cup, handed Moore $800 for the drugs, and
departed. The video surveillance showed Flemons exiting
the store with the cup in her hand. After Flemons left the
store, the Flemonses met with their handling agents, gave
them the cup containing the cocaine, and submitted to a
search of their persons and vehicle. Hopkins placed the cup
containing the cocaine into an evidence bag.

Flemons again contacted Moore on October 17, 2002. She
told him in a recorded telephone conversation that she
wanted "two of them, the hard." Moore advised her to come
over. Before leaving for Moore's house, Flemons, her
husband, and their car were again searched, and Flemons
was given an audio recorder and $1,600 to purchase two
ounces of crack cocaine. When Flemons arrived at Moore's
house, he had only two small amounts of crack cocaine to
sell. Flemons explained that she wanted two ounces, not
two "rocks," and Moore told her he needed additional time.
The Flemonses left Moore's house and went to meet Agent
Hopkins. Approximately twenty to thirty minutes later,
Flemons called Moore, and he instructed her to meet him at
210 Howard Avenue in Rockford, Illinois. The Flemonses
drove to that location, and Moore led her into a house.
Agent Hopkins and Officer Brian Skaggs of the Rockford
Police Department followed the Flemonses to the Howard
Avenue location and maintained surveillance of the house.
A short time later, the officers observed Moore walk out of
the residence to a fence surrounding the property and
disappear from view. Flemons, who was still inside the
house, testified that she observed Moore through the
windows walk along the side of the house to the fence where
he bent over and retrieved two plastic bags. According to
Flemons, Moore brought the two bags back into the house
and sold them to her for $1,600. Flemons testified that each
bag contained what appeared to be one ounce of crack
cocaine. After the transaction was complete, Flemons

departed and returned to her handlers. Agent Hopkins took possession of the two plastic bags and the audio recorder and sealed the drugs in a heat sealed evidence bag. The Flemonses were again searched for additional cash or contraband, but none was found.

The substances that Flemons turned over to Agent Hopkins on September 13, October 9, and October 17, 2002, were analyzed by Jennifer Yezek, a DEA forensic chemist. According to Yezek's testimony during trial, the three substances she received were each individually sealed in evidence bags bearing a sticker with the signature of Agent Hopkins. She received the three evidence bags from an unidentified evidence technician. Yezek opened each bag and proceeded to inspect, weigh, and analyze the substances. She performed the following tests on each of the three samples: (1) a cobalt thiocyanate test; (2) a gas chromatography mass spectrometry test; and (3) an infrared spectrometry test. Based on her analysis, Yezek concluded that the substances gathered on September 13, October 9, and October 17, 2002, consisted of 6.6 ounces of cocaine powder, 26.9 grams of cocaine base, and 53.8 grams of cocaine base, respectively. During trial, the substances were introduced and admitted as government exhibits 16 (the 6.6 ounces of cocaine powder), 17 (the 26.9 grams of cocaine base), and 18 (the 53.8 grams of cocaine base).

On February 27, 2003, Moore was arrested by federal authorities on the basis of a complaint, filed by Agent Hopkins, which alleged that he had violated 21 U.S.C. § 841(a)(1) by knowingly and intentionally distributing powder and crack cocaine to one or more confidential sources. On March 11, 2003, the grand jury indicted Moore on the same three offenses.

On August 22, 2003, a final pre-trial conference was held before United States District Court Judge Philip G. Reinhard in the Northern District of Illinois, Western

Division. During the hearing, Moore's counsel represented
that, although he had previously filed a motion to have
Moore examined for competency, he presently felt that
Moore was competent to stand trial.[2] He also represented to
the court that Moore was not alleging "in any way, shape,
or form that [he] was legally insane at the time of the
offense." However, counsel did advise the court
that according to the Social Security Administration
("SSA"), Moore had been found to be totally mentally
disabled for the past nine years and had been receiving
social security disability in the amount of $1,200 per month.
Moore's counsel further advised the court for the first time
that he had been trying to obtain records from the SSA
documenting his disability but had not yet received them.
Upon hearing defense counsel's representations about
Moore's mental capacity, the government moved the district
court to bar Moore from presenting a diminished capacity
defense. Prior to the start of trial, the court granted the
government's motion, stating, "There shall not be mention
of diminished capacity as any defense nor can there be any
expert testimony raised as to the issue of if he has a mental
disability for Social Security purposes because there's been
no such disclosure." However, the judge also told the parties
that although he was barring Moore from presenting a
diminished capacity defense, he would not rule out the
introduction of the SSA records: "Subject to hearing what
the questions are that are posed to the defendant, should he
take the stand, I will allow that just to show as to his
basic intelligence." The only other mention of the SSA
records occurred at the end of the first day of trial when
government counsel informed the court that he still had not

---

[2] Prior to the final pre-trial conference, Moore's counsel had
moved to withdraw the motion for a competency examination, and,
at the time of the final pre-trial conference, the motion was no
longer pending.

received a copy of the records. Moore's counsel explained that he had not produced the records because he still had not received them. He then suggested that he would not be introducing the records because "the judge has basically ruled that they're not relevant." The district court responded by stating, "I've essentially ruled that he can probably testify [to] his mental condition—if he wants to tell us what his IQ is or something like that, he can do it, and if he can tell he's under a disability, I'll allow that, but that's about it."

The jury trial continued from August 26, 2003, through August 28, 2003. Moore did not testify at trial nor did he present any witnesses in his defense. He did not move the court to admit his SSA records. The government called Flemons, Agent Hopkins, and Officers Swank and Cunningham to testify as to the transactions and conversations between Flemons and Moore. In addition, the government presented the testimony of Jennifer Yezek, the forensic chemist, Joseph Ambrozich, a DEA fingerprint analyst, and Steven Johnson, a veteran police officer with the Rockford Police Department who testified as an expert in the area of narcotics distribution investigation. On August 28, 2003, the jury found Moore guilty on all three counts, and the court entered judgment on each of the verdicts. On September 10, 2003, Moore filed a motion for judgment of acquittal and, in the alternative, a request for a new trial. Judge Reinhard denied each request in a minute order dated September 12, 2003. On October 10, Moore filed a motion for an examination to determine his competency for sentencing, and Judge Reinhard granted the motion. After the competency review conducted under the supervision of the United States Bureau of Prisons in Butner, North Carolina, the court held an evidentiary hearing on March 25, 2004, to determine Moore's competency. During the hearing, Dr. Adam Wooten, the psychiatrist who evaluated Moore while he was at Butner, testified

as to his examinations of Moore. Wooten testified that although Moore suffered from depression, he believed that Moore's medication, Zoloft, successfully controlled his depression. He further opined that Moore appeared able to understand the nature of the proceedings against him and to assist his counsel during the sentencing phase. Defense counsel then called Moore's fiancee, Meighan Fitzgerald, to testify. Fitzgerald testified that Moore constantly asked her the same questions during a single visit and that he had stopped writing her letters. After hearing the arguments of counsel, Judge Reinhard determined that Moore was competent to proceed with sentencing, stating:

I've had the opportunity to read the forensic evaluation by Dr. Wooten thoroughly, and I've also had the opportunity to view his testimony both on cross examination and direct examination. I've also had the opportunity to read the presentence investigation report and to view Mr. Moore throughout the trial, and he actually was on videotape during portions of the evidence that were used by the government against him.

The court concludes . . . that I have a qualified psychiatric opinion that has not been rebutted, except by some lay testimony, which in certain circumstances could overcome expert testimony. But under these circumstances, having listened to the psychiatrist testify and having read the history taken by Dr. Wooten, the examination that he had of the defendant over a period of time, his observation over a period of time, also the psychological testing that confirms aspects of depression, but also while it may state some conclusions about that [sic] he was hallucinating, it does not in any way negative, in my opinion, the medical opinion by Dr. Wooten that the defendant is not suffering from a mental disease or defect rendering him mentally

incompetent to the extent he's unable to under-
stand the nature and consequences of the proceed-
ings against him or properly assist Mr. Phillips in
his own defense.

There is lay testimony, as I indicated, from Ms.
Fitzgerald, which are observations of him. I think
they are not inconsistent with somebody who is
depressed awaiting sentence, and there's no indica-
tion by her testimony, in my opinion, that he's
unable to understand legal concepts. Assuming that
her testimony is accurate that he sometimes re-
peats questions, that, in my opinion, does not
overcome the testimony [of Dr. Wooten].

I saw him in person and on videotapes, and
there's no doubt—at least throughout the entire
trial, in my opinion, he was competent, and any
depression that he may have is not unusual for a
person who is now facing a sentence after being
convicted and being out on bond.

On April 23, 2004, Judge Reinhard sentenced Moore
to a term of 175 months in the custody of the United States
Bureau of Prisons. On April 29, 2004, Moore filed a Notice
of Appeal for his conviction and his sentence.

## II. Analysis

Moore raises four issues on appeal. First, he claims
that the district court prevented him from presenting
evidence that he did not understand the narcotics terminol-
ogy used in his conversations with Rosa Flemons. Specifi-
cally, he argues that the court precluded him from introduc-
ing SSA records which he claims would have revealed his
limited ability to understand coded narcotics terminology.
Next, he argues that the government failed to lay the
proper foundation for the expert testimony of Jennifer

Yezek, the DEA forensic chemist, as required by Rule 702 of the Federal Rules of Evidence. He also contends that the court erred when it denied his post-trial motion and ruled that the government had proved him guilty beyond a reasonable doubt despite inconsistent and contradictory testimony from Flemons. Finally, Moore argues that the district court erred when it ruled that he was competent to be sentenced.

A.  Introduction of Evidence

Moore claims that the district court erred in precluding him from introducing his SSA records. Prior to and during trial, defense counsel made it clear to the district court that he did not intend to introduce the records as evidence in support of a legally insane or diminished capacity defense; rather, Moore argues that the records would have provided evidence that he was mentally incapable of understanding his conversations with Flemons in which both parties used coded drug language. The government contends that despite his suggestion to the contrary, Moore never sought to introduce the SSA records, and the district court never precluded Moore from presenting those records to the jury.

Federal Rule of Evidence 103(a)(2) states, "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." Fed. R. Evid. 103(a)(2). This rule effectively requires a defendant to present his evidentiary arguments to the trial court in order to preserve the issue for appeal. Although this circuit does not require litigants to make formal offers of proof when evidence is excluded, "the record must show the equivalent: grounds for

admissibility, the proponent must inform the court and opposing counsel what he expects to prove by the excluded evidence, and he must demonstrate the significance of the excluded testimony." *United States v. King*, 75 F.3d 1217, 1223 (7th Cir. 1996) (citing *United States v. Peak*, 856 F.2d 825, 832 (7th Cir. 1988)).

Prior to the start of trial, the district court briefly addressed the admissibility of the SSA records in ruling on the government's motion in limine to preclude Moore from presenting a diminished capacity defense.[3] Although Judge Reinhard granted the government's motion in limine, his ruling allowed Moore to seek leave of court to introduce the records for a limited purpose: "Subject to hearing what the questions are that are posed to the defendant, should he take the stand, I will allow that just to show as to his basic intelligence." During trial, Moore never sought leave to introduce the SSA records and made no attempt at an offer of proof. Defense counsel suggested that Moore would not introduce the records because "the judge has basically ruled that they're not relevant." However, immediately after defense counsel's statement, Judge Reinhard clarified his ruling, stating, "I've essentially ruled that he can probably testify [to] his mental condition—if he wants to tell us what his IQ is or something like that, he can do it, and if he can tell he's under a disability, I'll allow that, but that's about it." Although the district court left the door open to offer the SSA records, Moore's counsel never sought to introduce the

---

[3] The court notes that unlawfully distributing cocaine in violation of 21 U.S.C. § 841(a)(1) is a general intent crime, *see United States v. Manganellis*, 864 F.2d 528, 539 (7th Cir. 1988), and diminished capacity is a defense only to specific intent crimes, *see United States v. Fazzini*, 871 F.2d 635, 641 (7th Cir. 1989) (citing *United States v. Twine*, 853 F.2d 676, 679 (9th Cir. 1988)). Thus, a diminished capacity defense was not available to Moore.

documents during trial.[4] By failing to make an offer of proof, Moore forfeited the issue. Thus, we will review the exclusion of this evidence only for plain error.[5] *See* Fed. R. Evid. 103(d) ("Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court."); Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").

The Supreme Court has established a four-part plain error standard. *See United States v. Cotton*, 535 U.S. 625, 631-32 (2002); *Olano*, 507 U.S. at 732. Before an appellate court can correct an error not raised at trial, there must be "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *Cotton*, 535 U.S. at 631 (quoting *Johnson*

---

[4] Part of Moore's argument is that since he did not have the SSA records in his possession, he could not seek to introduce them during trial. As conceded by Moore's counsel during oral argument, the first mention of the SSA records to the district court occurred at the final pre-trial conference on the Friday prior to the start of trial. While Moore's counsel advised the court that he had filled out a request but had not yet received the records, he did not request the court's assistance in securing those records during the final pre-trial conference nor at any time thereafter. *See, e.g.*, Fed. R. Crim. P. 17(c) (governing subpoenas for the production of documents). Moreover, he did not request a continuance of the trial in order to secure those documents. For these reasons, this court is unpersuaded by Moore's argument that he could not introduce the documents because he did not have them.

[5] "Forfeiture" is "the failure to make the timely assertion of a right", as opposed to "waiver," which is "the intentional relinquishment or abandonment of a known right." *United States v. Olano,* 507 U.S. 725, 733 (1993); *United States v. Davis*, 15 F.3d 1393, 1407 n.4 (7th Cir. 1994). "Waiver precludes appellate review, but forfeiture permits review for plain error." *United States v. Jaimes-Jaimes*, 406 F.3d 845, 847 (7th Cir. 2005).

*v. United States*, 520 U.S. 461, 466-67 (1997)). If all three requirements are met, an appellate court may review a forfeited error, "but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Cotton*, 535 U.S. at 631-32 (alteration in original) (quoting *Johnson*, 520 U.S. at 467).

Moore's argument fails to clear the steep hurdle imposed by the plain error standard. In his appellate brief, Moore suggests that the SSA records were necessary to demonstrate "his deficient mental condition to explain to the jury why the words he used during these conversations [with Flemons] did not refer to cocaine and were not 'code' for cocaine as alleged by the Government." However, Moore fails to explain how the SSA records would have established that he was mentally incapable of understanding the coded drug language. The records would not have said anything about Moore's understanding of the particular conversations in question. Moreover, they would not have said anything about Moore's ability to comprehend coded narcotics terminology. The records alone would not demonstrate that Moore did not understand any of the specific conversations he had with Flemons. At most, the records would have demonstrated that the SSA had determined that he suffered from a mental disability and was entitled to disability benefits under the Social Security Act. Moore would have then needed to call an expert to interpret the records and explain the effect his mental disability had on his ability to understand language; however, Moore never obtained, or indicated that he wanted to obtain, an expert to testify about his alleged mental impairment.

Furthermore, Moore did not testify at trial, which would have been the logical way to present evidence con-

cerning his history of mental illness.[6] On numerous occasions the trial court stated that it would not prohibit Moore from testifying that he did not understand the narcotics terminology used in his conversations with Ms. Flemons. Similarly, his counsel did not even see fit to question the government's law enforcement expert about how an individual with mental disabilities would have been confused by the drug terminology used during the drug sales. The court's decision to bar the SSA records did not preclude Moore's theory of the defense because he had sufficient means to present that theory to the jury but chose not to do so. *See King*, 75 F.3d at 1222.

Furthermore, any erroneous exclusion of Moore's SSA records was harmless in light of the overwhelming evidence of Moore's guilt. Moore was convicted for actually selling cocaine, not merely discussing a sale of the illegal substance. Regardless of what was said between Moore and Flemons, the government presented more than ample evidence during trial of the actual sale of narcotics by Moore to Flemons. On three separate occasions Flemons went to a location prescribed by Moore (his home or his mother's thrift store) and each time she returned with cocaine. Before each visit she, her husband, and their car were searched and found clean of drugs, and, during each visit, she was monitored by law enforcement personnel. Considering the totality of evidence presented at trial, we are convinced that even if we were to determine that the district court had committed an error in dealing with the admissibility of the SSA records, we would deem it to be harmless error.

---

[6] As set forth earlier, Moore also failed to make an offer of proof at any time during the trial.

B. Chain of Custody

Moore next claims that the district court erred in admitting the testimony of the government's forensic chemist, Jennifer Yezek. Moore makes a fleeting *Daubert* challenge to Yezek's testimony, arguing that the government failed to lay the proper foundation for her expert testimony as required by Rule 702 of the Federal Rules of Evidence. However, beyond referencing the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-95 (1993), his only specific argument is that her testimony was unreliable because the government failed to establish a chain of custody for the drugs she analyzed.[7] Moore argues that the government failed to establish that its exhibits 16, 17, and 18 were actually the evidence collected from Flemons after her encounters with Moore and that the samples were not contaminated before they reached Yezek. At trial, Moore's counsel objected during Yezek's direct examination, arguing that she was speculating when she testified that she received the samples from an evidence technician who had retrieved them from a vault. The trial judge overruled the objection in part, finding that Yezek could testify that she received the samples from an evidence technician, but he sustained the objection as to any testimony about where the samples were before they came into her possession.

A district court's evidentiary rulings, including matters concerning the chain of custody, are reviewed for abuse of discretion. *United States v. Scott*, 19 F.3d 1238, 1245 (7th Cir. 1994). " 'The standard for the admission of exhibits into

---

[7] Moore's counsel also failed to object to the foundation of her testimony at trial. After the government questioned Yezek about her credentials and then tendered her as an expert, defense counsel stated that he had no objection as to the foundation of her testimony, and the district court accepted her as a qualified expert in the field of chemistry and the analysis of narcotics.

evidence is that there must be a showing that the physical exhibit being offered is in substantially the same condition as when the crime was committed.'" *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988) (quoting *United States v. Aviles*, 623 F.2d 1192, 1197 (7th Cir. 1980)). It is well accepted in this circuit that "[a] perfect chain of custody is not a prerequisite to admission,"*United States v. Smith*, 308 F.3d 726, 739 (7th Cir. 2002), as "gaps in the chain normally go to the weight of the evidence rather than its admissibility," *Lott*, 854 F.2d at 250. Furthermore, "the government need only show that it took reasonable precautions to preserve the original condition of the evidence, it does not have to exclude all possibilities of tampering with the evidence . . . . [a] presumption of regularity exists with respect to official acts of public officers and, absent any evidence to the contrary, the court presumes that their official duties have been discharged properly." *Id.* (internal citations omitted); *see also Aviles*, 623 F.2d at 1198; *United States v. Lampson*, 627 F.2d 62, 65 (7th Cir. 1980).

During his testimony, Agent Hopkins described the procedure for handling the substances turned over to him by Flemons. He stated that when he received the substances (all in clear bags) from Flemons, he put the bag and its contents into an evidence bag,[8] "heat-sealed" the top opening of the evidence bag, and then placed an evidence sticker with the date, the case number, and his signature on the evidence bag. He stated that his department maintained custody of the evidence bags at the DEA office in Rockford until transferring the bags to the North Central Regional Lab in Chicago. Yezek testified at trial that she weighed government exhibits 16, 17, and 18 and analyzed the contents for the presence of narcotics. She stated that she

---

[8] Agent Hopkins testified that an evidence bag has three factory seals and an opening at the top through which he would place the evidence.

obtained each of the exhibits from a DEA evidence technician in a heat-sealed evidence bag with a label bearing Agent Hopkins' signature. Yezek explained how she opened each evidence bag, removed the substance from its original packaging, and tested the substances. She sent the original packaging for fingerprint analysis and identified each exhibit she examined by a laboratory control number unique to that exhibit.

Moore argues that the "missing links" in the chain of custody include the government's lack of specifics concerning the transfer of the exhibits from the DEA field office in Rockford to the North Central Regional Lab in Chicago and the transfer of the exhibits from the laboratory technician at North Central to Yezek. *See Lott*, 854 F.2d at 250. Although he has raised the possibility of tampering during these transfers, Moore has failed to point to any evidence that even suggests tampering or casts doubt on the authenticity of the exhibits. Having reviewed all of the trial testimony of Agent Hopkins and Yezek, the court is satisfied that the exhibits were at all times kept in official custody; thus, the presumption of regularity attaches. Moreover, according to Yezek's trial testimony, the evidence bags bearing Agent Hopkins' signature were heat-sealed when she received them and remained sealed until she began her analysis. The chain of custody for each exhibit was substantially complete, and, based on this record and the relevant case law, we refuse to conclude that the district court abused its discretion in admitting exhibits 16, 17, and 18 and allowing Ms. Yezek to testify as to those exhibits. *See, e.g.*, *United States v. Williams*, 44 F.3d 614, 618 (7th Cir. 1995) (finding a sufficient chain of custody despite the lack of testimony regarding how drugs seized at a crime scene were transferred to the drug analysis lab).

C.  Insufficiency of the Evidence

Moore next argues that the evidence presented at trial was insufficient to support his conviction for possession with intent to distribute cocaine and cocaine base. "A party challenging the sufficiency of the evidence supporting a jury conviction faces a steep uphill battle." *United States v. Graham*, 315 F.3d 777, 781 (7th Cir. 2003). We have previously stated that a challenge to the sufficiency of the evidence poses a "nearly insurmountable hurdle." *United States v. Frazier*, 213 F.3d 409, 416 (7th Cir. 2000). In evaluating a sufficiency of the evidence claim, we must determine whether " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir. 1986) (quoting *Jackson v. Virginia*, 443 U.S. 307 (1979) (emphasis in original)). "An appellate court will not weigh the evidence or assess the credibility of the witnesses. 'Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.' " *Ramirez*, 796 F.2d at 214-15 (internal citations omitted) (quoting *United States v. Peters*, 791 F.2d 1270, 1308 (7th Cir. 1986)).

Moore argues that the government's case depended entirely on Flemons' testimony, which he characterizes as inconsistent, contradictory, and thus unreliable. Moore points to trial testimony by Flemons in which she stated that a conversation between them was not recorded, then later changed her testimony and stated that the same conversation was recorded.[9] Moore also argues that the

---

[9]  As set forth in the factual background, Flemons did not wear a recording device on September 13, 2002, the first time she

(continued...)

cocaine could have come from Flemons and not him. As support for this argument, Moore highlights the fact that neither of the Flemonses were given a body cavity search or internal examination before their meetings with Moore.

Moore's argument that Flemons' testimony is unreliable amounts to an attack on her credibility. "Credibility is for the jury, not this court, to determine." *United States v. Mejia*, 909 F.2d 242, 245 (7th Cir. 1990). This court will not interfere "[w]hen a jury has chosen to credit crucial testimony with full knowledge of the many faults of the witness providing it . . . ." *United States v. Woolfolk*, 197 F.3d 900, 904 (7th Cir. 1999). During trial, Moore's counsel took the opportunity to thoroughly cross-examine Flemons regarding her prior convictions, her inconsistent statements, and her cooperation with the government in exchange for a reduced sentence. After hearing Flemons' testimony, including defense counsel's attempts to discredit her, the jurors obviously determined that Flemons' testimony was credible. A review of the record reveals that her testimony, although evincing minor inconsistencies, was by and large consistent with the other evidence presented, including the testimony of three officers who supervised the buys as well as the audio and video surveillance. Because the record does not reveal her testimony to be unreliable as a matter of law, the jury was entitled to its credibility determination. *See United States v. Pagan*, 196 F.3d 884, 889 (7th Cir. 1999) ("The extent to which [the informant's] personal failings and motivations may have influenced his testimony was for the jury to decide."); *United States v. Dunigan*, 884 F.2d 1010, 1013 (7th Cir. 1989) ("Mere inconsistencies in the witness' testimony do not render it legally incredible.").

---

[9] (...continued)
purchased cocaine from Moore. She did wear recording devices during the encounters on October 9, 2002, and October 17, 2002.

Moreover, even if the jury had some misgivings about Flemons, the government's case did not rest solely on her. The government certainly placed emphasis on the testimony of Flemons, who met with Moore on three occasions (two of which were recorded) and spoke to him on the telephone several times. However, the government also presented a plethora of other evidence, including but not limited to audio and video tape recordings of the alleged drug transactions, the testimony of three law enforcement officers who organized, supervised, and observed the transactions, the unchallenged expert testimony of a forensic chemist who opined that the substances given to Hopkins by Flemons contained cocaine and cocaine base, and the expert testimony of Steven Johnson, an officer with twenty-six years of law enforcement experience, who deciphered the coded narcotics vocabulary used by Moore during his conversations with Flemons. The jury had the opportunity to view video recordings of Moore meeting with Flemons during two of the controlled drug buys arranged by law enforcement, to listen to Flemons and Moore negotiate a sale—albeit in coded language—and to hear the testimony from the officers and forensic chemist concerning the substances she brought back from her meetings with Moore. Based on the totality of the evidence presented and the applicable case law, we conclude that the jury could reasonably have inferred that Moore possessed and intended to distribute cocaine and cocaine base.

D.  Competency to be Sentenced

Moore's final argument is that the trial court erred in finding him competent to be sentenced. Approximately six weeks after the jury trial and prior to his sentencing, Moore's counsel informed the trial judge that Moore had become disoriented and was no longer able to adequately assist counsel in presenting his defense. Moore's coun-

sel requested an examination to determine whether Moore was competent to be sentenced. The trial court granted Moore's motion for a psychiatric examination and Moore was sent to the United States Bureau of Prisons in Butner, North Carolina, for evaluation. After Moore's evaluation at Butner, the court held a competency hearing and determined that Moore was competent to proceed with and assist counsel in preparing for the sentencing phase of the trial proceeding.

When the trial court has held a hearing and made findings about the competency of a defendant, as it did in this instance, "we will overturn those findings only upon a showing that they are clearly erroneous." *United States v. Collins*, 949 F.2d 921, 924 (7th Cir. 1991) (quoting *United States v. Garrett*, 903 F.2d 1105, 1116 (7th Cir. 1990)). In order for a defendant to be found incompetent, the evidence must demonstrate that he did not understand the nature and consequences of the proceedings against him and that he was unable to assist in his own defense. *See United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1012 (7th Cir. 1984).

Moore first argues that because his counsel raised and supported his incompetency claim, his claim had more merit. Moore cites several Seventh Circuit cases that state that an attorney's failure to raise the issue of competency is evidence of a defendant's mental fitness. Moore then argues that these cases also stand for the proposition that an attorney's request for a competency hearing makes his client's claim more meritorious. However, "[a] defense motion for a competency hearing is not sufficient to create 'reasonable cause' for the judge to believe the defendant is incompetent." *Collins*, 949 F.2d at 925. Rather, a defendant's motion for a competency hearing "simply inform[s] the court that the defendant, himself, put his competency in issue." *Id*. In other words, merely filing a motion to determine competency does not mean that the motion is meritori-

ous. Similarly, a trial judge's decision to order a competency hearing has no bearing on whether reasonable cause exists to believe that a defendant was incompetent; rather, the order simply demonstrates the judge's decision to comply with the dictates of the statute providing for competency hearings. *See id.*

In finding Moore competent to be sentenced, Judge Reinhard relied on Dr. Wooten's psychiatric examination and diagnosis as well as his own observations of Moore's behavior on the videotapes, during the trial, and prior to the competency hearing. Although Dr. Wooten diagnosed Moore as suffering from depression, he stated that Moore's medication appeared to control his depression.[10] He also testified that Moore had no difficulty accomplishing daily activities, such as eating and tending to personal hygiene, and that Moore understood the crimes he had been charged with, the possible penalties he faced, the role of his attorney, and the role of the trial judge. Furthermore, nothing in the record demonstrates that during pre-trial or trial proceedings, Moore acted in a manner that would even suggest incompetence, and Moore has failed to identify any questionable conduct during the trial or sentencing hearing that would lead the court to doubt his competency. Instead, Moore rests his claim on his attorney's assertions and the lay testimony of his fiancée that he became withdrawn and disengaged after trial. This behavior, as pointed out by the

---

[10] We have previously determined that depressive condition in and of itself does not usually prevent a defendant from understanding the proceedings against him or prohibit him from assisting in his own defense. *See United States v. Teague*, 956 F.2d 1427, 1432 (7th Cir. 1992) (stating that "major depression, generalized anxiety disorder and borderline personality disorder are not psychiatric problems that would prevent a defendant from understanding the proceedings against him and interfere with his ability to confer with his attorney on his own behalf.").

trial judge, is consistent with depression, which is not unusual for a person facing a stiff sentence after conviction and being out on bond. Furthermore, his fiancée did not testify that he was unable to understand the charges against him or the penalties he faced. Neither the lawyer's request for a hearing nor his fiancée's testimony, without any corroborating expert opinion, generates "a real, substantial, and legitimate doubt" as to Moore's competence. *Collins*, 949 F.2d at 927. Thus, the district court did not clearly err in determining that Moore was competent to be sentenced.

## III. Conclusion

The district court did not err in excluding or admitting the evidence referred to herein, and there was ample evidence in the record for a jury to convict Moore on three counts of knowingly and intentionally distributing cocaine and cocaine base in violation of 21 U.S.C. § 841(a)(1). Finally, the district court's determination that Moore was competent to be sentenced was not clearly erroneous. The court AFFIRMS both the conviction and the sentence of the district court.

A true Copy:

　　　Teste:

　　　　　　　　　　　　_____
　　　　　　　　　　　　*Clerk of the United States Court of*
　　　　　　　　　　　　*Appeals for the Seventh Circuit*