Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio



## OPINION

No. 04-08-00206-CR

Walter Aaron **HAMILTON,**
Appellant

v.

The **STATE** of Texas,
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 2006-CR-3927
Honorable Sid L. Harle, Judge Presiding

Opinion by:    Steven C. Hilbig, Justice

Sitting:    Rebecca Simmons, Justice
Steven C. Hilbig, Justice
Marialyn Barnard, Justice

Delivered and Filed: August 31, 2009

AFFIRMED

A jury convicted Walter Aaron Hamilton of four counts of aggravated sexual assault, one count of aggravated robbery, and one count of aggravated kidnapping. On appeal, Hamilton contends the trial court erred by: (1) denying his motion to suppress; (2) admitting the complainant's in-court identification; and (3) admitting an expert's testimony regarding DNA evidence. We affirm the trial court's judgment.

## MOTION TO SUPPRESS

In his first issue, Hamilton contends the trial court erred in denying his motion to suppress evidence seized from his vehicle. He argues items removed from his car should not have been admitted into evidence because they were seized without a warrant during an illegal inventory search. Hamilton contends the inventory search was improper, and therefore cannot serve as an exception to the warrant requirement, because the State failed to prove it was conducted "according to standard police procedure." *See Gauldin v. State*, 683 S.W.2d 411, 415 (Tex. Crim. App. 1984) (holding that in absence of testimony regarding "actual adherence to standard police inventory procedure," State does not sustain its burden of proof), *overruled on other grounds by State v. Guzman*, 959 S.W.2d 631, 633 (Tex. Crim. App. 1998). He further argues that because information from the warrantless search was used in part to support the application for the subsequent search warrant, any items seized pursuant to the warrant must also be suppressed.

### *Background*

At the hearing on Hamilton's motion to suppress, Bexar County Deputy Sheriff George Johnston testified he approached Hamilton's car at 12:42 p.m. in a relatively desolate area in Bexar County. Officer Johnston had seen Hamilton's car parked in the same location an hour earlier. Deputy Johnston stated he thought the driver might have fallen asleep while eating lunch.

As Deputy Johnston approached Hamilton's car, he noticed the engine was on and saw Hamilton lying in the driver's seat. Hamilton appeared to be asleep. Deputy Johnston initially knocked, then "banged" on the window in an attempt to gain Hamilton's attention. When this failed, the deputy opened the vehicle and physically shook Hamilton. When Hamilton did not respond, Deputy Johnston called an ambulance.

Medical personnel arrived and were unable to awaken Hamilton. They transported him to a hospital for further treatment. Deputy Johnston began to inventory the vehicle and discovered a backpack containing a package of "zip ties," a roll of duct tape, a knife, a B&B pistol, and a ski mask. After discussion with the other deputies, the inventory search was halted so a search warrant could be obtained. Based on items discovered during the inventory, the deputies were concerned items in the car were related to a sexual assault committed nearby a day earlier. Eventually, a search warrant was obtained to search the vehicle.

The State presented three witnesses who testified about the sheriff department's policy for impounding and inventorying vehicles. Deputy Johnston explained that because Hamilton was transported to the hospital, the deputy was responsible for the vehicle, and it could not be left at its current location. He stated the sheriff's department has a policy that requires an inventory of any impounded vehicle to safeguard against loss or theft. Deputy Johnston further testified he followed department policy by conducting the inventory, including when he looked inside the backpack.

Bexar County Deputy Sheriff Detective Roger Pedraza also testified about his department's policy on inventory searches. Deputy Pedraza stated the policy had been in effect during his nineteen years of service, and explained he ordered the inventory halted when it became apparent evidence of a crime was discovered. Finally, Bexar County Deputy Sheriff Detective John Mahon stated he was the lead investigator in the sexual assault case and was made aware of the items discovered during the inventory. Deputy Mahon testified the sheriff's office has a written inventory policy and that policy or protocol was followed by Deputy Johnston when he inventoried Hamilton's vehicle after Hamilton was taken away by medical personnel.

At the conclusion of the suppression hearing, the trial court denied the motion to suppress. The record does not contain any request for findings of fact or conclusions of law.

**Discussion**

A trial court's ruling on a motion to suppress is reviewed under an abuse of discretion standard. *Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005); *Perez v. State*, 103 S.W.3d 466, 468 (Tex. App.—San Antonio 2003, no pet.). We examine the evidence in the light most favorable to the trial court's ruling and give great deference to the trial court's determinations of historical fact. *Corbin v. State*, 85 S.W.3d 272, 276 (Tex. Crim. App. 2002); *Perez*, 103 S.W.3d at 468. When no findings of fact or conclusions of law are entered, we imply findings of fact in support of the trial court's judgment when those facts are supported by the record. *State v. Kelly*, 204 S.W.3d 808, 818-19 (Tex. Crim. App. 2006). We review the application of the law to the facts *de novo*. *Id.*; *Perez*, 103 S.W.3d at 468.

"When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). "These procedures developed in response to three distinct needs: [1] the protection of the owner's property while it remains in police custody; [2] the protection [of] the police against claims or disputes over lost or stolen property; and [3] the protection of the police from potential danger." *Id*. (citations omitted). "A peace officer's inventory of the contents of an automobile is permissible under both the Fourth Amendment and Article I, section 9 if conducted pursuant to a lawful impoundment." *Garza v. State*, 137 S.W.3d 878, 882 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd); *see also Opperman*, 428 U.S. at 373 (concluding inventories pursuant to standard police

procedures are reasonable); *Laney v. State*, 117 S.W.3d 854, 858 (Tex. Crim. App. 2003) (noting automobile inventory doctrine is an exception to the warrant requirement).

The record supports an implied finding that the inventory of Hamilton's vehicle was conducted according to the policy of the Bexar County Sheriff's Department. Because the inventory was proper, any information obtained during the inventory that was subsequently used to obtain the search warrant was not tainted. Accordingly, any evidence found pursuant to the search warrant was admissible. We hold the trial court did not abuse its discretion in denying the motion to suppress, and we overrule Hamilton's first issue.

### IN-COURT IDENTIFICATION

Hamilton next contends the trial court erred in refusing to suppress the complainant's in-court identification. He argues the complainant, who was unable to identify Hamilton from a photographic array near the time of the offense, should not have been permitted to make an in-court identification because it was "tainted by unwarranted suggestiveness" when the complainant was allowed to observe him before jury selection. At the time the complainant saw Hamilton, he was seated at the defense table with his attorneys.

#### *Background*

The complainant, R.C., was a realtor. On the day of the offense, she was working at a sales trailer in a subdivision that was being developed. Around 3:45 p.m., a man came into the sales trailer, and R.C. showed him some floor plans and printed out some listings for him. At approximately 4:45 p.m., R.C. told the man she had to leave. He followed her into an office and assaulted her.

R.C. described her attacker as having reddish-blond hair and green eyes. A few days after the incident, R.C. was shown a photographic lineup but was unable to identify Hamilton's picture. No other identification was attempted before trial, which took place more than two years after the crime. Apparently some time before the presentation of evidence, R.C. entered the courtroom and observed Hamilton seated at the defense table. She recognized Hamilton as her attacker. The defense filed a motion to suppress the in-court identification.

At a hearing outside the presence of the jury, R.C. testified she always knew she would recognize her attacker when she actually saw him. R.C. stated she was certain Hamilton was the person who assaulted her as soon as she saw him in the courtroom because of his hair color and the shape of his body. When questioned why she did not identify Hamilton from the photo array, R.C. stated she was looking for "a kind of blond, lighter reddish hair," and none of the men in the photographs had lighter hair. She also explained none of the men appeared clean and professional as Hamilton had appeared on the day of the offense, and his photograph was a "bad" photograph. At the conclusion of the hearing, the court denied the motion to suppress.

*Discussion*

"An in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pretrial [ ] identification." *Loserth v. State*, 963 S.W.2d 770, 771-72 (Tex. Crim. App. 1998). We apply a two-step analysis when a defendant challenges an in-court identification. *Id.* at 772. Considering the totality of the circumstances, we determine whether the pretrial identification procedure was impermissibly suggestive. *Id*. If so, we then determine whether the procedure was so impermissibly suggestive as to give rise to a "very substantial likelihood of irreparable misidentification." *Id*. It is the defendant's burden to establish these elements by clear and

convincing evidence. *Loserth v. State*, 985 S.W.2d 536, 543 (Tex. App.—San Antonio 1998, pet. ref'd).

Reliability is the critical question in determining the admissibility of the in-court identification. *Loserth*, 963 S.W.2d at 772. "Testimony is reliable if the totality of the circumstance reveals no substantial likelihood of misidentification despite a suggestive pretrial procedure." *Loserth*, 985 S.W.2d at 543. In assessing reliability, the following five non-exclusive factors enunciated in *Neil v. Biggers*, 409 U.S. 188 (1972), should be weighed against the corrupting effect of the suggestive pretrial procedure:

(1) The opportunity of the witness to view the criminal at the time of the crime;

(2) the witness's degree of attention;

(3) the accuracy of the witness's prior description of the criminal;

(4) the level of certainty demonstrated by the witness at the confrontation; and

(5) the length of time between the crime and the confrontation.

*Loserth*, 963 S.W.2d at 772 (citing *Biggers*, 409 U.S. at 199). The foregoing five factors are all issues of historical fact and should be considered deferentially in the light most favorable to the trial court's ruling. *Id*. at 773. We apply a *de novo* review in weighing the factors against the corrupting effect of the suggestive pretrial procedure, and we need not assign the same weight or significance to the historical facts as the trial court in deciding the ultimate question of reliability. *Id*. at 773-74.

Applying the *Biggers* factors, we conclude the trial court did not abuse its discretion in denying the motion to suppress R.C's in-court identification of Hamilton. R.C. had an extensive opportunity to view Hamilton during the hour he was in the sales trailer with her discussing houses; her degree of attention was high given the setting and her efforts to sell Hamilton a house; her initial

description of Hamilton as having reddish-blond hair and green eyes was fairly accurate; and her explanation for her failure to identify Hamilton from the photographic line-up was plausible. R.C.'s level of certainty was high, and she testified that she always knew that she would be able to identify Hamilton when she saw him. Although the time between the crime and the trial was two years and two months, after weighing all the *Biggers* factors in the light most favorable to the trial court's ruling, we conclude the totality of the circumstances reveals no substantial likelihood of misidentification despite R.C. viewing Hamilton for a brief period in the courtroom before the trial commenced. Hamilton's second issue is overruled.

## ADMISSIBILITY OF DNA EXPERT TESTIMONY

In his final issue, Hamilton asserts the trial court violated his confrontation rights when it admitted the testimony of Garon Foster regarding Hamilton's DNA. Foster testified based on DNA tests that Hamilton could not be excluded as the donor of the spermatozoa identified on the vaginal and labial swabs taken from R.C. or of the biological material on the breast swabs taken from R.C. Although Foster expressed an opinion based on his evaluation of the data, he also testified over objection to the results of the DNA analysis conducted by Erica Graham, another scientist whose work was supervised by Foster. Hamilton also contends his confrontation rights were violated because Foster, in making his conclusions, relied on the work of Graham and her processing of the DNA material.

### Background

Foster testified he is a forensic scientist supervisor at the Bexar County Criminal Investigation Laboratory, and was the supervisor when Erica Graham performed the serology and DNA analysis on Hamilton's case. At the time of Hamilton's trial, Graham was no longer employed

with the Bexar County lab. Graham screened the physical evidence in Hamilton's case for biological material and developed a DNA profile for R.C., Hamilton, and the biological material from the physical evidence. Foster stated he had access to Graham's notes and those notes indicated Graham followed the appropriate protocol and methods to develop the DNA profiles. Foster described for the jury the various steps involved in the creation of the DNA profiles, but stated concluding whether a person's DNA is a "match" with an unknown substance is accomplished by the scientist comparing graphs of each DNA profile. He also testified that as part of the lab's accreditation requirements, two scientists must independently review the data and come to the same conclusion before issuing the report. Foster testified he originally reviewed Graham's work before the report in Hamilton's case was issued, and he agreed with its results. Foster also reviewed his analysis a second time in preparation for trial. Foster testified Graham's reports reflect Hamilton's DNA was not excluded as the donor of the spermatozoa identified on the vaginal and labial swabs taken from R.C. or of the biological material on the breast swabs taken from R.C. Foster further testified the odds of another person having the same DNA profile as Hamilton is approximately one in seven quadrillion. Foster stated he conducted his own review of the data and agreed with the results reported by Graham.

### Discussion

A defendant's right to confrontation under the Sixth Amendment is violated when a witness is permitted to relate out-of-court "testimonial" hearsay statements unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 59 (2004); *see De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008). A statement is testimonial if it was made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541

U.S. at 52. Whether a statement is testimonial is a question of law. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2008). Once an objection is made based on *Crawford*, the proponent of the statement must demonstrate its admissibility. *De La Paz,* 273 S.W.3d, at 680-81. We review *de novo* the trial court's ruling admitting evidence over a confrontation objection. *Wall*, 184 S.W.3d at 742.

Hamilton asserts that reports of DNA analysis are testimonial. He primarily relies on a case from this court holding a trial court erred in admitting a latent print report prepared by a person who did not testify in court. *See Acevedo v. State*, 255 S.W.3d 162, 173 (Tex. App.—San Antonio 2008, pet. ref'd). The State counters that *Crawford* is not implicated because Graham's report was neither offered nor admitted into evidence, and an expert may offer his own opinion based on another person's report even though the report itself may be inadmissible. *See Martinez v. State*, 22 S.W.3d 504, 508 (Tex. Crim. App. 2000). However, *Martinez* was not decided on confrontation grounds, but on whether an expert may opine before the jury when his opinion is based in part on "hearsay" documents. Furthermore, in *Martinez*, the court of criminal appeals noted neither the non-testifying expert's data nor his opinion was ever placed before the jury. Here, in contrast, most of the State's evidence centered on the actions and conclusions of Graham, the non-testifying expert. Because the State placed before the jury the work and the conclusions of the non-testifying expert, we must determine whether DNA reports prepared by a forensic scientist employed by Bexar County are testimonial.

The State urges this court to adopt the reasoning expressed in *Campos v. State*, 256 S.W.3d 757 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). In that case the Fourteenth Court of Appeals held a DNA report was not testimonial because, in part, the report was neutral, not

accusatory, and had the potential to either support a conviction or exonerate the defendant. *Id*. at 765. However, we are cognizant of the United State's Supreme Court's recent decision in *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527 (2009), which was rendered after the briefs in this matter were filed. In *Melendez-Diaz*, the court ruled that reports produced by state chemists regarding the results of their analysis of suspected drugs were testimonial. 129 S.Ct. at 2532. In its analysis, the Court rejected the reasoning expressed in *Campos* that reports of "neutral, scientific testing" somehow fall outside the protections of the Confrontation Clause. *Id*. at 2536-38. In light of *Melendez-Diaz*, we hold Graham's reports of her DNA analysis were testimonial. The trial court therefore erred in allowing Foster to testify as to Graham's findings.

Hamilton also complains that his right of confrontation was violated when Foster testified as to the procedures and protocols employed by Graham to produce the DNA profiles Foster used to reach his opinion. We disagree. In his testimony, Foster explained the procedures used to create DNA profiles. He essentially told the jury that a series of scientific instruments are used to "crack open" the DNA material, replicate the material, and then separate the DNA according to its size. Foster stated a machine he described as a "genetic analyzer" is used to create a printout with a series of lines or graphs. A scientist will compare the printout produced by the unknown DNA sample with the one produced by the known DNA sample to determine if there is a "match." When a second review of the lab work is conducted as required by the lab protocols and accreditation standards, it is accomplished by looking at the printout, either on paper or on the computer.

The precise question here – whether an expert witness who offers his opinion based in part on lab work performed by another violates the Confrontation Clause – does not appear to be addressed in *Melendez-Diaz*. However, the Supreme Court noted:

> [W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. While the dissent is correct that "[i]t is the obligation of the prosecution to establish the chain of custody," *post,* at 2546, this does not mean that everyone who laid hands on the evidence must be called. As stated in the dissent's own quotation, *ibid.,* from *United States v. Lott,* 854 F.2d 244, 250 (C.A.7 1988), "gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony *is* introduced must (if the defendant objects) be introduced live. Additionally, documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records.

*Id.* at 2532 n.1. This passage indicates the Supreme Court would hold records or information created

by personnel that play a role in the analysis that leads to the expert's opinion are not testimonial. *See*

*id.*

We are also persuaded by the court's reasoning in *United States v. Washington*, 498 F.3d 225

(4th Cir. 2007), cert. denied, 129 S.Ct. 2856 (2009). In *Washington*, the court considered this very

issue. In that case, the court held an expert witness could express his opinion, without violating the

Confrontation Clause, as to whether alcohol and drugs were present in Washington's blood when

he was arrested and charged with operating a motor vehicle under the influence of drugs or alcohol.

*Id*. at 231. The court reasoned the raw data produced by the scientific instruments were not

testimonial statements, as the data were in essence "statements" by the machine rather than the

operator of the instrument. *Id*. The Confrontation Clause implicates statements made by persons,

not machines. *Id.; see Blaylock v. State*, 259 S.W.3d 202, 205-08 (Tex. App.—Texarkana 2008, pet.

ref'd) (holding Confrontation Clause not violated by testimony of chemist that substance was cocaine

when opinion based on data and notes of analysis performed by different chemist), *cert. denied*, 129

S.Ct. 2861 (2009). Accordingly, we hold Foster's opinion, based on data generated by scientific instruments operated by other scientists, did not violate the Confrontation Clause.

### Harm Analysis

The trial court erred in allowing Foster to testify as to Graham's findings. We must determine whether the error was harmful, requiring reversal. Federal constitutional error is harmless and not reversible if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967); *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007). "Under *Chapman*, a federal constitutional error 'did not contribute to the verdict obtained' if the verdict 'would have been the same absent the error.'" *Clay*, 240 S.W.3d at 904 (quoting *Neder v. United States*, 527 U.S. 1, 15-18 (1999)). The *Chapman* test is codified in rule 44.2(a) of the Texas Rules of Appellate Procedure. *Clay*, 240 S.W.3d at 904.

To assess the likelihood that, absent the trial court's error in admitting the evidence, the jury's verdict would have been the same, we must examine the entire record. *Id.* Among the factors to consider are: (1) the importance of the evidence to the State's case; (2) whether the evidence was cumulative of other evidence; (3) the presence or absence of other evidence corroborating or contradicting the evidence on material points; and (4) the overall strength of the State's case. *Id.* We must also consider any other factor in the record that may shed light on the probable impact of the trial court's error on the minds of average jurors. *Id.*

Applying the relevant factors, we conclude Hamilton was not harmed by the erroneous admission of Foster's testimony about Graham's findings. Based on the victim's identification of Hamilton as her attacker, the importance of the DNA evidence was moderate. Evidence of Graham's report was cumulative because Foster properly testified to his opinion that Hamilton was not

excluded as the contributor of the DNA found on evidence samples obtained from the victim. No other evidence contradicted the evidence of Graham's analysis, and a great amount of evidence supported it – the victim identified Hamilton as her attacker based on the hour she spent with him prior to the assault, the victim's credit cards were found in the pocket of Hamilton's jacket, Foster's testimony as to his independent opinion that Hamilton was not excluded as a donor of the DNA, and Foster's testimony that the odds of a "random probability match" was one in seven quadrillion. The State's case against Hamilton was strong without the evidence of Graham's analysis. Accordingly, we conclude beyond a reasonable doubt the erroneous evidence did not contribute to his conviction, and we overrule Hamilton's third issue.

### CONCLUSION

Having overruled Hamilton's issues, we affirm the trial court's judgment.

Steven C. Hilbig, Justice

PUBLISH