Affirmed and Memorandum Opinion filed August 23, 2011.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-10-00266-CR

___________________

 

Jovany Jampher Paredes, Appellant

 

V.

 

The State of Texas, Appellee



 



 

On
Appeal from the 337th District Court

Harris County,
Texas



Trial Court Cause No. 1241896

 



 

 

MEMORANDUM OPINION

A jury found appellant, Jovany
Jampher Paredes, guilty of capital murder and the trial court imposed the
mandatory sentence of lifetime confinement in the Texas Department of Criminal
Justice, Institutional Division without the possibility of parole.  See Tex.
Penal Code Ann. §§ 12.31(a), 19.03(a)(2) (West 2011).  Finding no error, we
affirm.

Factual and Procedural Background

            There is a large
number of people involved in this appeal.  Appellant is a member of SPPL, a Houston-area
street gang.[1] 
SPPL has chapters located in at least two different parts of the Houston
metropolitan area: Katy and Club Creek.[2]
 La Primera is a second Houston-area street gang.  In addition to appellant, the
SPPL members involved are Marina Montalvo, Eric Aguilar, Omar Pimental, Roberto
Barcenas, Jessica Perez, Joe Rivera, and Luis Cano.  The only member of La
Primera relevant to this appeal is Raul Trevino, who was Montalvo’s boyfriend
at the time of the events at issue in this appeal.  Finally, one person not affiliated
with any gang was involved: Vanessa Baretto.[3]


Abelardo Sanchez and the complainant, Rafael Sanchez
Cantu, lived in apartment 95 of the Kingsgate Apartments in southwest Houston. 
They were shot and killed when members of SPPL and La Primera broke into their
apartment in an attempt to steal money and drugs after one of the apartment
residents sold them a bad batch of cocaine.  Appellant was charged by
indictment with murdering Cantu while in the course of committing and
attempting to commit robbery. 

            Three members of
SPPL testified against appellant.  Rivera and Perez testified and were
determined to be accomplices as a matter of law.  Cano also testified against
appellant but the trial court submitted an instruction for the jury to
determine whether he was an accomplice.  Because appellant has challenged the
sufficiency of the evidence corroborating the accomplice witness testimony, we
present the matter of law accomplice testimony separate from the remainder of
the evidence.

I.         Accomplice
Witness Testimony

            A.        Jessica
Perez

            Perez joined the
Katy branch of SPPL in 2005 when she was 16 years old.  Perez testified that
Cano was the founder and leader of the Katy branch of SPPL while appellant was
the leader of the Club Creek branch.

In the summer of 2007 Perez had a disagreement with
Trevino, Montalvo’s boyfriend and a member of La Primera.  Appellant intervened
in the disagreement.  Appellant arranged for Trevino and Perez to meet on
Saturday, September 1 at Perez’s apartment complex.  In addition, many other
members of SPPL attended that meeting.  Perez testified that her disagreement with
Trevino was worked out late in the evening and the meeting then turned into a
party that continued into the early morning hours of September 2.  According to
Perez, appellant, Trevino, Montalvo, Aguilar, Baretto, Pimental, Barcenas, and
Rivera participated in the party.  Perez also testified that Cano was present
at the party in the afternoon but departed before the events underlying this
appeal began.  During the party, the participants drank, smoked marijuana, and
used cocaine.

Eventually the group decided to go to Galveston.  The
nine remaining partiers got into appellant’s white Pontiac and Baretto’s gray
Mitsubishi Eclipse.  Initially they travelled to the Kingsgate Apartments where
appellant, Trevino, and Aguilar got out of the vehicles and purchased more
cocaine from a dealer who lived in the apartment complex.  After purchasing the
cocaine, appellant, Trevino, and Aguilar returned to the vehicles and the group
set out for Galveston.  Perez was driving appellant’s Pontiac while the other
occupants of the vehicle used the cocaine.  The group arrived in Galveston
about dawn on September 2.

Once on the beach, Perez testified that appellant,
Barcenas, and Aguilar moved away from the rest of the group and engaged in a
serious conversation.  Perez testified that the trio eventually returned to the
group and appellant was mad because he believed the cocaine they had purchased
at the Kingsgate Apartments was too weak because it had been cut down too
much.  According to Perez, appellant wanted to go back to the Kingsgate
Apartments and get his money back.  The rest of the group went along with
appellant.

The group drove back to the Kingsgate Apartments where
they arrived at about 10:00 a.m.  Everyone except for Perez, Trevino, and
Vanessa got out of the cars and walked around a corner.  The six walked back to
the cars a few minutes later.  The group left the apartment complex and drove to
a nearby gas station where appellant called Cano and asked for "the
AK."  Following appellant’s telephone conversation with Cano, the group in
appellant’s Pontiac drove to Katy where they met Cano in a Wal-Mart parking
lot.  According to Perez, they pulled up beside Cano’s car and Cano slid an
AK-47 rifle into appellant's car.  Perez testified that the Wal-Mart parking
lot was a large parking lot that served other business establishments,
including a Denny’s restaurant.

Next, appellant contacted another gang member and
obtained a handgun from him.  The group in appellant’s Pontiac then drove back
to the gas station near the Kingsgate Apartments.  Once the two vehicles had
come back together, Aguilar came up to the window of appellant’s Pontiac and
the group began discussing a plan to rob the Kingsgate drug dealer.  Both
vehicles returned to the Kingsgate Apartments where they parked around the
corner and out of sight from apartment 95, the drug dealer’s apartment.  Everyone
except Perez and Baretto exited the cars and walked around the comer toward
apartment 95.[4]
 As the group walked around the corner and out of Perez’s sight, appellant carried
the AK-47, Rivera a revolver, and Aguilar had a third gun.  Soon after the
group rounded the comer out of Perez's sight, Perez heard a gunshot.

Following that initial gunshot, Perez saw Montalvo,
Barcenas, Aguilar, and Pimental running back to the cars.  They initially got
back into the cars but then Montalvo told them to go back and get the rest of
their group.  In response to Montalvo’s urgings, the four went back around the
corner.  After the four moved back toward apartment 95, Perez and Baretto moved
both cars to a point in the apartment complex parking lot where Perez could see
some of the group outside of the apartment.[5] 
At that point in time, Perez heard more gunshots and everyone came running back
to the cars.  Trevino came back carrying a black rifle with a scope.  According
to Perez, this black rifle was unlike any of the weapons the group had carried
with them when they originally left the cars.  Rivera was carrying a plate of
cocaine.  Finally, appellant returned still carrying the AK-47.  After getting
back into the two cars, the group drove back to Perez’s apartment, where they
arrived at about noon. 

Once they had arrived at Perez’s apartment complex,
the group went straight into Perez’s apartment bedroom.  Once in the bedroom,
Trevino asked Perez for a rag to clean the guns.  After giving Trevino a rag,
he proceeded to clean the black gun.  In addition, appellant asked Perez for
another shirt to replace the one he was wearing because it had blood on it. 
Appellant took off his shirt and gave it to Perez and told her to wash it. 
Instead, she put the t-shirt in her closet with her dirty laundry and never did
get around to washing it.  After stashing appellant’s shirt in her closet,
Perez went to take a shower.  When Perez returned to the group, appellant told
her he had hidden the AK-47 in her closet.  

After she came back from taking a shower, Perez heard
everyone talking about what had happened at the Kingsgate Apartments. 
Appellant admitted that he had shot someone and “there was blood gushing out
like a river.” 

B.        Joe Rivera

Rivera testified that he was a member of SPPL.  Rivera
recalled that he arrived at Perez’s apartment about 10:00 p.m. the night of
September 1, 2007.  Rivera rode to Perez’s apartment in Baretto’s Mitsubishi
Eclipse.  Rivera testified that Aguilar, Trevino, and Montalvo also rode to the
party with Baretto.  Rivera did not see Cano at Perez’s apartment that evening.

According to Rivera, everyone was drinking, smoking
marijuana, and using cocaine at the party.  Rivera testified that the group ran
out of cocaine about 3:00 a.m.  At that point, everyone left in two cars to go
get more cocaine from a dealer at the Kingsgate Apartments.  Rivera explained
they knew they could get the cocaine at the Kingsgate Apartments because the dealer
there was a friend of Trevino’s.  Once they arrived at the Kingsgate
Apartments, appellant and Trevino got out of the cars and moved out of sight to
purchase the cocaine.  When appellant and Trevino returned, the group left the
Kingsgate Apartments and drove down to Crystal Beach, arriving just before
sunrise.  Everyone spent the next hour using the cocaine.

While the others were using the cocaine, appellant
and Trevino walked away from the group and conversed for about thirty minutes
to an hour.  When they returned, appellant was very upset because he thought the
cocaine was weak.  According to Rivera, appellant wanted to return to the
Kingsgate Apartments and rob the dealer.  While appellant was “fired up” over
the weak cocaine, the rest of the group was tired and uninterested in settling
the score with the dealer over such a small amount of money.   Despite the
others lack of interest, appellant kept talking about the bad cocaine for about
twenty minutes and eventually rallied everyone to go along with his robbery
plan.  Appellant stated they would take the dealer's drugs and money. 

The group returned to the Kingsgate Apartments at
about 9:00 a.m.  As appellant discussed the proposed robbery, Trevino cautioned
appellant that the dealers had an assault rifle in their apartment.  At that
point in time, the group had only a single gun, a revolver, which belonged to
Rivera and was being held by Trevino.  Appellant, Rivera, and Trevino approached
the back door of the apartment, intending
to knock on the door under the pretext of seeking to buy more cocaine.[6]  Their knocks,
however, went unanswered for five minutes so they returned to the cars. 

Appellant decided the group needed more guns, so he
called Cano and said, "We need the AK.  We're going to pick it up."  They
drove toward Katy where they met Cano in the parking lot of a Sam’s near the
intersection of Interstate 10 and Highway 6.  When Cano pulled up, appellant
got out of his car and got the gun from Cano and got back into his car.  After
the exchange, Cano drove off and had no further involvement with the group.  The
group then got a .22-caliber revolver from Spooky, another SPPL gang member,
and they drove back to the Kingsgate Apartments, arriving at about 11:00 a.m.  Appellant
loaded the AK-47 on the drive back to the apartments.

Once they reached the Kingsgate Apartments, everyone
got out of the cars and appellant formulated a plan to rob the dealers of their
drugs and money.  Perez and Baretto remained in the cars while the other gang
members approached the apartment.  Appellant had the AK-47, Trevino had a .38-caliber
handgun, and Aguilar had the .22-caliber revolver.  While walking toward the
back door of apartment 95, appellant concealed the AK-47 in a Rockets jersey.[7]  Appellant, Trevino,
and Rivera knocked on the back door of the apartment and pretended to be interested
in buying more cocaine.  An occupant opened the door and invited them inside.  At
that point, appellant came forward with the AK-47.

They walked into the kitchen and the gang members
noticed someone was asleep on the sofa in the living room.  Trevino approached
the man on the sofa, tried to wake him up and when that failed, he hit him in
the head with a gun.  The gang members then cornered the two known occupants of
the apartment.  Trevino then pointed his gun at the two men and demanded to
know where the drugs and money were located.  Appellant also pointed his gun at
both men and demanded money and drugs.  The men claimed they did not have
anything.  While appellant and
Trevino were dealing with the two occupants, Rivera began searching the kitchen
for drugs and money.  

While Trevino watched the two men cornered in the
living room, appellant walked down a hallway toward the bedroom area of the
apartment.  He initially turned toward the bedroom located in the southwest comer
of the apartment.  Appellant removed the Rockets jersey from his weapon,
pointed it into the bedroom, and demanded drugs and money from a man in the
bedroom.  Rivera, who was still searching the kitchen, heard a man in the bedroom
tell appellant he did not have any money or drugs.  Appellant then fired about
five shots from the AK-47 into the bedroom.  The occupant of the southwest
bedroom did not make any further noise after the gunshots.

Appellant returned to the living room and instructed Rivera
to help him check the other bedroom.[8] 
While Trevino stayed with the two occupants in the living room, Rivera followed
appellant into the southeast bedroom.  Rivera did not see anyone in the
bedroom, but he immediately saw “a big plate of dope” on a table.  While Rivera
began bagging and pocketing the dope, appellant walked toward a closed door in
the southeast bedroom.  Appellant tried to open the door but it was locked. 
Appellant then shot the doorknob, the door came open and a man came running out
of the bathroom crying, screaming, and yelling.  As he did so, he pointed a
rifle at appellant.  Appellant attempted to shoot this man with the AK-47, but the
gun jammed.  Appellant then called out to Trevino for help.  Trevino ran back
to the southeast bedroom and fired one shot at the man pointing the rifle at
appellant, who then fell back on the bed.  Trevino grabbed the rifle out of the
hands of the man on the bed, hit him with it, and then took off with the rifle.
 

The three intruders left the apartment through the
front door and ran back to the waiting cars.  Trevino carried the rifle, Rivera
carried the plate of dope, and appellant still had the AK-47.[9]  The group then
got back into the cars and drove off.   They drove to Perez’s apartment where
Rivera saw appellant change his shirt.  When the group left Perez’s apartment,
appellant drove Rivera home in his white Pontiac.  

II.        Non-Accomplice
Evidence

Police officers arrived at apartment 95 of the
Kingsgate Apartments and found a dead body in both of the apartment's bedrooms.[10]  The body of the
complainant was found in the southwest bedroom.  He died as a result of a
gunshot wound to his chest.  The police found Abelardo Sanchez’s body in the
southeast bedroom.  Abelardo suffered five gunshot wounds.  The investigating
officers found a Rockets jersey on the hallway floor between the two bedrooms.  They
also recovered eight fired bullets and nine casings that were consistent with
an AK-47 rifle.  

Serafin Zuniga, a witness living in a nearby
apartment, provided the police with a description of one of the getaway cars, a
white Pontiac, and its partial license plate number.  Officers traced this car
to appellant and arrested him in it the day after the murders.

Houston Police Officer Curtis Scales arrested Perez
on September 4, two days
after the murders.  During the arrest, Scales recovered an AK-47 from her
closet.  Subsequent testing revealed that several of the cartridge casings
recovered from the murder scene were fired by the AK-47 found in Perez’s
closet.[11]

Several weeks later, Perez notified Scales about a
white t-shirt that appellant wore during the commission of the crime.  Perez
told Scales that appellant had instructed her to wash it, but she threw it into
her closet instead.  Scales recovered the shirt from Perez.  Subsequent DNA
testing of the shirt revealed that a bloodstain on the shirt matched Abelardo
Sanchez's DNA.  In addition, a scraping of the shirt's collar produced DNA
material from three contributors, with one of the three being the major
contributor.  DNA testing identified appellant as that major contributor. 

Cano testified that he was a member of SPPL, but he
was not very active in the gang at the time of the murders.  Cano also
testified that he owned the AK-47 used in the murders.

Cano recalled that he was in Katy having breakfast
with his girlfriend at a Denny’s restaurant the morning of September 2, 2007,
when appellant called him between 10:00 a.m. and noon.  Appellant asked to
borrow his AK-47.  Cano told appellant he could borrow the AK-47 if he wanted
to come to the Denny’s to get it.  A short time later, appellant called Cano
again to inform him he was outside in the Denny’s parking lot.[12]  Cano paid for
his meal and then went outside where appellant’s white Pontiac was a few
parking spaces away from his truck.  Cano removed the AK-47 from his truck and
handed it to appellant who wrapped it in something white.  Appellant did not
say why he wanted the AK-47 and Cano did not inquire.  Following the exchange
with appellant, Cano went to his girlfriend's home in Katy.  Cano specifically
testified that he was not present when the murders occurred. 

Discussion

            In two issues on
appeal, appellant asserts the trial court erred (1) when it denied his motion
for instructed verdict because there was insufficient evidence to corroborate
the testimony of accomplice witnesses Jessica Perez and Joe Rivera; and (2)
when it allowed a DNA analyst to offer expert testimony about DNA test results
in violation of the Confrontation Clause.  We address each issue in turn.

I.         Corroboration
of Accomplice Witness Testimony

            We begin by
addressing whether the accomplice witness testimony of Perez and Rivera is
sufficiently corroborated to serve as a basis for appellant’s conviction.[13]

A conviction cannot be secured upon the testimony of
an accomplice witness unless corroborated by other evidence tending to connect
the defendant to the offense.  Cocke v. State, 201 S.W.3d 744, 747 (Tex.
Crim. App. 2006).  Article 38.14 of the Texas Code of Criminal Procedure
provides: “A conviction cannot be had upon the testimony of an accomplice
unless corroborated by other evidence tending to connect the defendant with the
offense committed; and the corroboration is not sufficient if it merely shows
the commission of the offense.”  Delacruz v. State, 278 S.W.3d 483, 487
(Tex. App.—Houston [14th Dist.] 2009, pet. ref’d) (quoting Tex. Code
Crim. Proc. Ann. art.  38.14 (West 2005)).  The Court of Criminal Appeals, in
interpreting Article 38.14, has held it is not necessary that the corroborating
evidence directly connect the defendant to the crime or that it be sufficient
by itself to establish guilt; the corroborating evidence need only tend to
connect the defendant to the offense.  Id.  (citing Cathey v. State,
992 S.W.2d 460, 462 (Tex. Crim. App. 1999); McDuff v. State, 939 S.W.2d
607 (Tex. Crim. App. 1997)).  When determining whether non-accomplice evidence
tends to connect a defendant to the offense, the Court of Criminal Appeals has
stated that the evidence must simply link the accused in some way to the
commission of the crime and show that rational jurors could conclude that the
evidence sufficiently tended to connect the defendant to the offense.  Simmons
v. State, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009).  When analyzing a
challenge to the sufficiency of corroborative evidence, an appellate court
views the evidence in the light most favorable to the jury’s verdict.  Brown
v. State, 270 S.w.3d 564, 567 (Tex. Crim. App. 2008).  Thus, when there are
conflicting views of the evidence, one tending to connect the defendant to the
offense and one that does not, a reviewing court will defer to the factfinder’s
resolution of the evidence.  Id.  For that reason, “it is not
appropriate for appellate courts to independently construe the non-accomplice
evidence.”  Smith v. State, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). 


The test for sufficient corroboration of accomplice
testimony is to eliminate from consideration the accomplice testimony and then
examine the other inculpatory evidence to ascertain whether the remaining
evidence tends to connect the defendant with the offense.  Delacruz, 278
S.W.3d at 487.  A reviewing court cannot examine the corroborating evidence
piecemeal; instead it must consider the combined force of all of the
non-accomplice evidence that tends to connect the defendant to the offense.  Smith,
332 S.W.3d at 442.  When examined in that light, the cumulative effect of suspicious
circumstances may be enough to tend to connect the defendant to the charged
offense even if they are insufficient to do so when examined individually.  Yost
v. State, 222 S.W.3d 865, 872 (Tex. App.—Houston [14th Dist.] 2007, pet.
ref’d).  Viewed collectively, even otherwise insignificant incriminating
circumstances may tend to connect a defendant to a crime he is accused of
committing.  Id.  Thus, proof that the accused was at or near the scene
of the crime at or about the time of its commission, when coupled with other
suspicious circumstances, may tend to connect the accused to the crime so as to
furnish sufficient corroboration to support a conviction.  Smith, 332
S.W.3d at 443.

After eliminating the accomplice witness testimony
recounted above, we conclude that the non-accomplice evidence was sufficient to
tend to connect appellant to the murder of the complainant.  This evidence
includes the t-shirt recovered from Perez’s apartment.  Subsequent testing of
this shirt revealed a bloodstain containing the DNA of Abelardo Sanchez, the
other person killed in apartment 95 on September 2, 2007.  In addition,
scrapings taken from the collar of the shirt were tested.  The results revealed
three contributors.  The testing also established that appellant was the only
major contributor.  The presence of appellant’s DNA and the DNA of the murder
victim shot and killed mere feet away from the spot where the complainant was murdered
tends to connect appellant to the complainant’s murder.  See Vasquez v.
State, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002) (clothes containing the
blood of the victim’s boyfriend who was present in the room where the murder
occurred that were found in the trunk of defendant’s vehicle corroborated
accomplice’s testimony); see also Barnes v. State, 62 S.W.3d 288, 301
(Tex. App.—Austin 2001, pet. ref’d) (holding that accomplice’s testimony
implicating the defendant in a masked robbery was corroborated by
circumstantial evidence and a discarded ski mask containing DNA matching the
defendant’s profile that was found a few hundred yards away from the scene of
the crime).

Appellant’s contention that the DNA evidence derived
from the collar scrapings is not corroborative because there were at least two
other DNA contributors is without merit.  First, appellant was the only major
contributor.  Second, the
evidence is viewed in the light most favorable to the verdict.  Brown,
270 S. W.3d at 567.  So when there are two permissible views of the
evidence, one that tends to connect the defendant to the offense and one that
does not, appellate courts adopt the interpretation that is more favorable to the
verdict.  Simmons, 282 S.W.3d at 508.  As such, the presence of other
people's DNA on the shirt collar does not diminish the corroborative nature of
the DNA evidence.  It still tends to connect appellant to the murders.

In addition, Cano’s testimony, when combined with
other non-accomplice evidence, tended to connect appellant to the murder.  Cano
testified that appellant called him on the day of the murders between 10:00
a.m. and noon.  Appellant told Cano he needed to borrow his AK-47 and indicated
he was coming to get it.  About twenty minutes later, appellant arrived in his
white Pontiac at Cano’s location in Katy and picked up Cano’s AK-47.  The
murders took place a short time after appellant obtained the AK-47.

The police found an AK-47 in Perez’s apartment when
they arrested Perez a few days after complainant’s murder.  Cano identified
that AK-47 as the gun he gave appellant on September 2, 2007 in the Katy
parking lot.  The police recovered numerous shell casings in apartment 95
during their investigation of the murders.  These shell casings were consistent
with an AK-47 rifle.  Donna Eudaley, the State’s firearms expert testified testing
revealed that several of the cartridge casings recovered from the murder scene
were fired by the AK-47 found in Perez’s closet.  The non-accomplice evidence
therefore reflects that appellant sought out and acquired the murder weapon right
before the murders occurred.

Appellant's possession of the murder weapon
immediately before the crime's commission is evidence that tends to connect him
to the murders.  Herron v. State, 86 S.W.3d 621, 633-34 (Tex. Crim. App.
2002) (defendant's possession of murder weapon was factor tending to connect
him to murder); Cathey, 992 S.W.2d at 462-63 (defendant's possession of
murder weapon one month after offense's commission was factor tending to
connect him to murder); Ayers v. State, 879 S.W.2d 176, 178 (Tex.
App.—Houston [14th Dist.] 1994, no pet.) (“Possession of the murder weapon is
proper corroborative evidence because it tends to connect the accused with the
offense in which the weapon was used.”).

We conclude that a rational jury could find that the
above non-accomplice evidence tends to connect appellant to the offense.  We
overrule appellant’s first issue on appeal.

II.        Confrontation
Clause

            Appellant’s
second issue deals with the testimony of Robin Freeman, a forensic scientist
and DNA analyst.  At the time of trial Freeman worked as the DNA Interpretation
Manager for the Harris County Institute of Forensic Sciences, formerly known as
the Harris County Medical Examiner’s Office.  Prior to that position, Freeman
worked as the forensic director of Identigene, a private DNA testing lab that
contracted with the Houston Police Department to perform DNA analysis work. 
Freeman recalled receiving appellant's t-shirt from the Houston Police
Department.  Freeman testified that a DNA analysis revealed that the DNA from a
stain on appellant’s t-shirt matched Abelardo Sanchez.  Freeman also testified
that scrapings from the shirt collar yielded a DNA mixture from at least three people, with one of the DNA
contributors being a major contributor.[14]  

Regarding
the DNA testing procedures, Freeman explained that DNA testing is "done in
a batch process."  In other words, DNA testing involves several steps and
different analysts perform these different steps in the process.  Using various
instruments and chemical reagents, one person performs the extraction process,
another analyst conducts the “quantitations,” and a third analyst does the
amplification and loads the data onto the instrument.  As the lab director,
Freeman testified she is qualified to perform all of these steps and that she supervised
the analysts who actually performed each step in the batch process.   From the
raw data generated by these preliminary steps, Freeman compiled the data and
performed the analysis that led to her opinions on the DNA evidence.  Freeman
was responsible for interpreting and comparing the DNA data.  Based on Freeman’s
interpretation of the compiled data, she formed the opinions from which she
testified about the DNA evidence during appellant’s trial.

            In Crawford v.
Washington, 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the
Supreme Court held the Sixth Amendment confrontation right applies not only to
in-court testimony, but also to out-of-court statements that are testimonial in
nature.  Wood v. State, 299 S.W.3d 200, 207 (Tex. App.—Austin 2009, pet.
ref’d) (citing Crawford, 541 U.S. at 51).  The Confrontation Clause
forbids the admission of testimonial hearsay unless the declarant is
unavailable to testify and the defendant had a prior opportunity to
cross-examine the declarant.  Id.  

Five years later, in Melendez-Diaz v.
Massachusetts, the defendant was on trial for selling cocaine.  Melendez-Diaz
v. Massachusetts, --- U.S. ---, 129 S.Ct. 2527, 2531, 174 L.Ed.2d 314
(2009).  During the trial, prosecutors offered affidavits from the lab
technicians to prove that the substance in question was cocaine.  Id. at
2531.  Unlike the case at bar, no expert witness took the witness stand in Melendez-Diaz.
 The Supreme Court held that the affidavits were a “core class of testimonial
statements” covered by the Confrontation Clause.  Id. at 2532.  The
Supreme Court then held that the technicians who prepared the affidavits were
witnesses the defendant had a right to confront.  Id.           

In his second issue on appeal, appellant contends his
Sixth Amendment right to confront the witnesses against him was violated when
Freeman testified about DNA test results when other, non-testifying analysts
were involving in the testing.  Appellant claims Freeman’s reliance on results
reached by other analysts denied him the right of confrontation in violation of
Melendez-Diaz v. Massachusetts.

This issue is not new as it has been previously
addressed in published opinions by at least two courts of appeal.  In Hamilton
v. State, the San Antonio Court of Appeals was faced with the question
“whether an expert witness who offers his opinion based in part on lab work
performed by another violates the Confrontation Clause….”  Hamilton v. State,
300 S.W.3d 14, 21 (Tex. App.—San Antonio 2009, pet. ref’d).  The court then
examined Melendez-Diaz and initially determined that the precise issue
before it was not addressed by the Supreme Court in that case.  It went on to
conclude that “the Supreme Court would hold records or information created by
personnel that play a role in the analysis that leads to the expert’s opinion
are not testimonial.”  Id.  It then held that an expert’s opinion “based
on data generated by scientific instruments operated by other scientists, did not
violate the Confrontation Clause.”  Id. at 22.

In Settlemire v. State, a DWI case, the Fort
Worth Court of Appeals faced the issue of whether the admission of breath test
results and intoxilyzer machine maintenance logs into evidence through the
testimony of a supervisor who did not conduct the breath test or perform the
maintenance violated the Confrontation Clause.  Settlemire v. State, 323
S.W.3d 520, 521 (Tex. App.—Fort Worth 2010, pet. ref’d).  As in this case, the
defendant cited Melendez-Diaz in support of his argument the trial
court’s decision to admit the records violated the Confrontation Clause.  The
court then stated:

Here, the individual, … who testified about the
intoxilyzer’s status although she did not supervise it at the time of Settlemire’s
intoxilyzer test, is precisely the type of analyst that the Court anticipated
might be challenged based on its holding in Melendez-Diaz.  The Court
made clear, however, that it did not intend its holding to “sweep [] away an
accepted rule governing the admission of scientific evidence.”  Id. at
2533.

We shall not construe Melendez-Diaz as doing what
the Court clearly stated it was not doing.  We hold Settlemire’s rights of
confrontation were not violated.

Id. at 522.

            In addition, in
an unpublished opinion, this court reached the same result.  In Oliver v.
State the defendant argued “his Sixth Amendment right to confront the
witnesses against him was violated because [the expert witness] testified
concerning DNA testing performed by other analysts.”  Oliver v. State, No.
14-09-00690-CR, 2010 WL 3307391, at *3 (Tex. App.—Houston [14th Dist.] August
24, 2010, no pet.) (op., not designated for publication).  Initially we
distinguished Melendez-Diaz by determining it “did not specifically
address the issue at bar-whether the Confrontation Clause is violated if an
expert offers oral opinion testimony based in part on work performed by another
who does not testify.”  Id.  We then addressed the specific facts before
the court:

            In the present case, Green testified the
medical examiner’s office employs a procedure termed “batch testing” when
testing DNA.  She explained that in “batch testing,” numerous analysts test the
genetic matter in an assembly-line-type process.  The tests of the materials in
this case were performed by approximately fifteen analysts using machines.

            As in Washington and Hamilton,
here, the machines generated raw-data results, and Green used those results to
form the basis of her opinion-that appellant was a contributor.  Applying the
holdings of Washington and Hamilton here, we conclude the
raw-data reports are not testimonial.  Thus, the Confrontation Clause was not
violated by Green’s testimony.

 Id. at *4 (internal
citations omitted).

We find the reasoning in these cases persuasive and
adopt it here.  Like the testifying experts in the above cases, Freeman offered
her expert opinion after she personally compiled the DNA data supplied by
non-testifying analysts, interpreted it, and performed the comparative
analysis.  An expert witness who offers her opinion based in part on lab work
performed by another does not violate the Confrontation Clause. Hamilton, 300
S.W.3d at 21-22.  Thus, we hold Freeman's reliance on data retrieved by some of
her lab colleagues did not render her expert opinions inadmissible and the
trial court did not err when it allowed her to testify.  We overrule
appellant’s second issue.

Conclusion

            Having overruled
appellant’s issues on appeal, we affirm the trial court’s judgment.

 

                                                                                    

                                                                        /s/        John
S. Anderson

                                                                                    Justice

 

 

 

Panel consists of Justices
Anderson, Seymore, and McCally.

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1] SPPL stands for Somos
Pocos Peros Locos which translates to “we are few but crazy.”





[2] Club Creek is located in
the southwestern part of Houston.





[3] Baretto was Eric
Aguilar’s girlfriend.





[4] Perez was driving
appellant’s Pontiac while Baretto was in the driver’s seat of her Mitsubishi. 





[5] Perez testified she could
not remember which members of the group she saw outside the apartment.





[6] While appellant, Rivera,
and Trevino approached the back door, Montalvo, Barcenas, Pimental, and Aguilar
were supposed to go to the front door of the apartment. 





[7] The plan for the robbery
remained the same as Montalvo, Barcenas, Pimental, and Aguilar were supposed to
go the front door of the apartment.   





[8] This was the apartment’s
master bedroom.  During trial it was frequently referred to as the southeast
bedroom.





[9] Rivera testified that he
never saw any of the group he was supposed to let in through the front door
actually enter the apartment.  Instead, he testified he opened the front door
and when he found no one there, he closed the door. 





[10] They also found a
seriously wounded Martin Sanchez.  Mr. Sanchez was the brother of Abelardo
Sanchez, one of the two people killed in the apartment.  Mr. Sanchez, who was
shot in the stomach, was in a coma for about two months but did testify during
appellant’s trial.  Mr. Sanchez admitted his brother Abelardo sold drugs out of
the apartment.





[11] Specifically, Donna
Eudaley, the State’s firearms expert identified State’s Exhibits 134, 135, 136,
139, and 140 as cartridge cases found by the police in Apartment 95 as having
been fired from the AK-47 found in Perez’s closet.





[12] Cano testified that the
Denny’s shared a parking lot with a Wal-Mart.





[13] The trial court
submitted the issue of whether Cano was an accomplice through the following
instruction in the jury charge:

If you believe from the
evidence beyond a reasonable doubt that an offense was committed and you
further believe that the witness, Luis Cano, was an accomplice, or you have a
reasonable doubt whether he was or not, as that term is defined in the
foregoing instructions, then you cannot convict the defendant upon the
testimony of Luis Cano unless you further believe that there is other evidence
in the case, outside of the testimony of Luis Cano tending to connect the
defendant with the offense charged in the indictment, and then from all the
evidence you must believe beyond a reasonable doubt that the defendant is
guilty.

Appellant did not object to this instruction during
trial and does not challenge it on appeal.  Appellant also does not argue on
appeal that Cano is an accomplice whose testimony must be corroborated by other
evidence in the case, or that Cano’s testimony cannot be used to corroborate
the testimony of Perez and Rivera.  We conclude Cano’s testimony can be used to
corroborate the testimony of Perez and Rivera.  See Gamez v. State, 737
S.W.2d 315, 323 (Tex. Crim. App. 1987) (“In light of the evidence, the court’s
charge and the jury verdict at the guilt stage of the trial it is clear the
jury found that Sanchez was not an accomplice witness.”); see also Korell v.
State, 253 S.W.3d 405, 412–13 (Tex. App.—Austin 2008, pet. ref’d)
(upholding jury’s implied finding that a witness was not an accomplice as a
matter of fact).





[14] A DNA analyst from
another private lab testified that appellant was a DNA match for the major
contributor.  Appellant does not challenge this testimony on appeal.